UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) | |
| vs. | ) ) | No. 1:22-cr-00072-MR-WCM |
| TIMOTHY MICHAEL DEVER, *Defendant*. | ) ) ) ) ) | |

**DEFENDANT'S SENTENCING MEMO**

Mr. Timothy Michael Dever pleaded guilty to accept responsibility his for criminal speech. He agrees that he should not have encouraged anyone to serve the so-called writs from a non-existent court announcing fictional sentences. By contrast, he stands ready to receive a real sentence from a real court. He asks for leniency.

**A. Nature & Circumstances of the Offense / History & Characteristics of the Defendant**

Despite the beliefs that resulted in this conviction, the 56-year-old Mr. Dever has never had a criminal conviction, has been married since 1993, and has a solid history of self-employment. True, he is now appropriately being held accountable for speech that crossed the line from First Amendment protected grievance into a crime. But the Government has pointed to no evidence of any actual or attempted violence in

1

his past. Nor has the Government pointed to evidence of planned or attempted violence in this case—either from him directly or from anyone in this case. No stockpiled guns. No casing of victims' homes. No practice runs. Mr. Dever certainly talked—too much and, at times, about inappropriate things. If actions speak louder than words, inaction should, too.

The discovery in this case suggests that the so-called People's Bureau of Investigation ("PBI") was all talk without actual plans to "arrest" anyone. For example: USA-0002015:



**Deetom**
Again, we are not involved and the arresting of the tyrants and we cannot control the mafia that they work for. Some municipalities are more just than others and there's no way to predict who's going to fire them, but if you don't serve the Moab they will continue in office for sure.

We hear from mini sources that they're jumping ship then fired and resigning etc etc etc. But again, we do not facilitate arrest.  9:44 AM

After you serve the Moab then they will be subject to arrest if they do not execute the documents provided to them. All we know is there's a $10,000 bounty on their head or $20,000 Bounty if they're an attorney so serve everybody you can and pray for the best.
↩ 4  9:45 AM

USA-0002023:



USA-0002024:



USA-0002026:



USA-0002029:



USA-0002034:



The Government unsuccessfully tries to claim that PBI had "soldiers willing to do their commander's bidding," [dkt. 153 at 4]. If so, when Mr. Dever made a direct and specific appeal to get people to show up in Asheville on October 25-27 to protest Ms. Moody's prosecution. [PSR ¶35], throngs would have shown up. To undersigned counsel's knowledge, however, no one did, much less anyone who prevented court proceedings. Once again, the PBI was shown to be all bark and no bite.

Indeed, the PBI was not a hierarchical organization in the classic sense of a street gang or cartel but instead a decentralized "movement" that, in Mr. Dever's mind, was essentially coextensive with humanity and/or all Americans. *See, e.g.*, USA-0003772:



It is not clear how many victims, if any, actually looked at the PBI website or other PBI content. Any that did so would have been hard pressed to view PBI as a sophisticated organization. After all, this was an organization that had grievances, among others, against "State Capitals" and "Antarctica":



[PSR ¶ 31].

The PBI content, including that produced by Mr. Dever and by the deceased co-Defendant Tom Murphy, obviously attracted eclectic individuals. Mr. Dever's pri-

mary purpose was to rectify what he saw as government refusal—in terms of regulation and enforcement actions—to ensure clean drinking water.[1] Indeed, his detention in this case has been harsher than it might be for other defendants given that Mr. Dever believes that the tap water contains harmful chemicals.[2] In his early meetings with undersigned counsel, Mr. Dever appeared at risk for dehydration due to insufficient water intake due to his reluctance to drink water at the jail.

While the Government is correct that many of the individuals whom Ms. Moody served with writs had little actual responsibility for water quality, the Government does not contend that Mr. Dever specifically selected the victims here. Yes, he did encourage service of writs on law enforcement generally. But he believed that the water pollution was a crime and that law enforcement was derelict in not ensuring

---

[1] At the same time, he obviously held views about perceived government overreach. Advancing those goals would undercut the ability to ensure clean water given the interstate (and international) causes of water pollution and the liberty interests that polluters would deem infringed by increased pollution controls. No internally consistent ideology was present.

[2] He has at least some cause to worry. Tap-water pollution involving as-of-yet unregulated / insufficiently chemicals is widespread. *See, e.g.*, https://www.cnn.com/2023/07/05/health/pfas-nearly-half-us-tap-water-wellness/index.html (last visited August 20, 2023) ("Almost half of the tap water in the US is contaminated with chemicals known as 'forever chemicals,' according to a new study from the US Geological Survey…."). Attached to the writs at issue in this case is a printout from a non-profit quality-quality organization showing the presence of potentially harmful chemicals in drinking water. See [PSR Ex. A (pdf p. 42)]. Rather than advocating service of the writs, however, he should have advocated voting out officials who do not make sufficient efforts to promote clean water.

that the water was as clean as he believed it ought to be. That the writ targets had—in reality—little to nothing to do with water is just further evidence of a lack of sophistication that is inconsistent with how the Government views the case. Unfortunately for the victims then and now for him here now, Mr. Dever advocated not only ineffectual but also illegal means—in the form of writs from a non-existent "environmental district court"—to advance what might otherwise have been the laudable goal of encouraging government officials to help ensure better drinking water for all.

With respect to the April 2023 jail calls produced in discovery practically on the eve of sentencing, they are largely beside the point. As the Government itself agrees, "the friend did most of the talking" and then Mr. Dever "repeated the statements" in the jail. [Dkt. 153 p. 17]. That Mr. Dever would be susceptible to believe that a governor of the supposed "Republic of Illinois" could pardon him or that a secret group of "white hat" U.S. Marshals existed who would release him shows his gullibility to the (deceased co-Defendant) Tom Murphys of the world and others like him. In the jail, he is not getting any mental-health counseling, as he will be required to attend while on supervised release.

Despite the mental stress that first-time incarceration would have on any of us, undersigned counsel can confirm that Mr. Dever has come a long way in his journey

9

from the depths of the conspiracy theories that frustrated many of undersigned counsel's early conversations with Mr. Dever. Indeed, in May 2023, when Dr. Cantley performed final her psychological testing on Mr. Dever, she noted that he was able to "maintain a degree of insight" and overcome "some of his previously held extreme overvalued beliefs," ultimately making "a marked improvement" from where he started from her pre-plea evaluation of him. [Dkt. 157-1 at 16]. That he has not yet finished his journey of is self-evident. The question for the Court is whether prison—with its isolation and dehumanizing design—is a better locale for finishing that journey than would be outpatient therapy as part of supervised release.

## B. Need for Just Punishment / Promote Respect for the Law

Mr. Dever was not legally insane at the time of his offense nor is he incompetent to receive punishment now. Yet, as the Court determines the appropriate sentence, it is surely relevant that Mr. Dever was trying to help his fellow citizens, albeit in his own misguided way. This case was not the more typical case, as even the Government concedes, involving "a personal grudge" or "hate speech directed at a member of a protected class." [Dkt. 153 at 1]. Further, the victims here are powerful individuals, including judges and mayors and other high officials. They are entitled to

10

be free from threatening communications just like everyone else is.[3] But in fashioning a sentence, undersigned counsel respectfully suggests that the Court should be sensitive to any public perception that the sentence ultimately meted out here might suggest that those powerful government officials are somehow entitled to *more* protection than others are.

**C. Need for Deterrence**

Undersigned counsel would likewise suggest that deterrence considerations are not particularly relevant to this case. This case did not involve attempt for financial gain, thus fewer if any costs need to be internalized via incarceration or a fine. *Cf. generally United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008) (*en banc*) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."). Further, Mr. Dever (and likely others who viewed PBI content) have psychological traits that, while perhaps not rising to a current mental disorder according to Dr. Cantley, certainly frustrated then, and would frustrate in the future, cold calculations of risks and benefits that the law assumes that the mine-run of criminal offenders make. In any

---

[3] Law-enforcement officials are actually constitutionally expected to endure slightly more verbal offense than others (although these writs crossed over that line, too). *See Houston v. Hill*, 482 U.S. 451, 462 (1962) ("[A] properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen and thus be less likely to respond belligerently to fighting words." (quotation and alteration omitted)).

11

event, with respect to specific deterrence in particular, undersigned counsel notes that Dr. Cantwell's psychological testing suggests a low likelihood of violence and confidence in his ability to follow conditions of supervised release—including the counseling that she believes he should receive. [Dkt. 157-1 at 18].

### D. Need to Provide Defendant with Appropriate Medical Care / Kinds of Sentences Available

Lengthy incarceration is not likely to help Mr. Dever overcome his challenges. His, at times alternate, worldview can pose interpersonal problems with others. While incarcerated, he already had a cellmate who sprayed chemicals in his face following a disagreement. As is typical in a correctional setting, the response to conflict was punitive isolation. As a Cornell School of Medicine factsheet summarizes, psychiatric literature shows the deleterious risks that such isolation poses, including potentially causing, exacerbating, and/or reviving mental disorders, including exacerbating paranoia and delusion:

# Is incarceration pathogenic?

Some have considered whether the conditions of incarceration in the United State themselves generate mental illness.[47]

- Prison conditions such as crowded living quarters, lack of privacy, increased risk of victimization, and exposure to punitive segregation are strongly correlated with emerging and worsening psychiatric symptoms (including self-harm).[48]
    - In 2015, 18 states and the Bureau of Prisons met or exceeded standards for overcrowding.
    - In 2015, 26 states and the Bureau of Prisons met or exceeded their minimum number of beds.[49]
    - Disorders likely to deteriorate during incarceration include major depression, posttraumatic stress disorder, anxiety, and psychosis.[50]
        - Incarceration more than doubles the odds of 12-month dysthymia.[51]
        - Incarceration increases the odds of 12-month major depression by nearly 50%.[52]
- In prison as in the wider community, psychiatric symptoms may be difficult to distinguish from aggressive or deviant behavior, resulting in further punishment. This pattern is enhanced by the limited treatment options available in incarceration settings.
    - Prison inmates with mental illness commit from 1.5 to 5 times as many infractions as other inmates.[53]
    - A national survey found that among state prisoners, 24% of those with a mental health disorder had been charged with physically or verbally assaulting correctional staff or other inmates, compared to 10.4% of those without a mental health disorder.[54]
        - The same survey found that 58% of those with a psychiatric disorder had been charged with rule violations of some stripe, compared to 43% of non-disordered inmates.[55]
    - In 2013 in New York City, prisoners with mental health disorders made up 38% of the jail population but were involved in 60% of all "incidents."[56]
        - Those who were "acutely mentally ill" made up 6% of the jail population, but were involved in 16% of misconduct incidents.[57]

## Mental Health and Punitive Segregation (Solitary Confinement)

- It is estimated that 100,000 prisoners in the United States are being held in solitary confinement at any given time.[58]
- Inmates diagnosed with mental illness are disproportionately represented in the isolation units.[59]
- Punitive segregation has serious short-term and long-term repercussions on mental health.[60]
    - Protracted isolation, inactivity, and lack of mental health treatment within isolation units can exacerbate symptoms or provoke recurrence.[61]
    - Symptoms can include anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis, often tending toward further infraction of rules.[62]
    - Suicides occur disproportionately more often in segregation units than elsewhere in prison.[63]
        - In New York, suicide rates are 5 times as high among prisoners in solitary confinement as among those in the general prison population.[64]

https://psychiatry.weill.cornell.edu/research-institutes/dewitt-wallace-institute-psy-

13

chiatry/issues-mental-health-policy/fact-sheet-0#footnoteref47_kpg37lm (last visited August 21, 2023). *See also* [dkt. 137-1 at 3 (discussing potential problems with incarceration)].

### E. The Guidelines

Even assuming that the PSR correctly calculated a total offense level of 31—rather than a 21, after undersigned counsel's objections set forth in the PSR Addendum—the Guidelines for this offense seem far out of proportion to other Guidelines, involving objectively worse conduct, for example:

- A defendant with criminal history I charged with an offense subject to the Guideline for aggravated assault could discharge a firearm at a victim, cause "permanent or life-threatening bodily injury," as part of a hate crime, proceed to trial thereby denying responsibility—yet still only have a total offense level of a 27, resulting in a Guideline range of 70-87 months. *See* U.S.S.G. §§ 2A2.2, 3A1.1

- A defendant with criminal history I charged with an offense subject to the Guideline for criminal sexual abuse (not involving 18 U.S.C. § 2241(c)), whose victim was a child under the age of 12, who timely pleaded guilty would face a total offense level of 31 (as the PSR deems applies here). *See* U.S.S.G. §§ 2A3.1; 3E1.1

- A defendant with criminal history I convicted—at a trial—of selling a person into slavery while brandishing a gun, and where the victim remained a slave for more than year would only face a total offense level of 29, resulting in a Guideline range of 87-108 months. *See* U.S.S.G. § 2H4.1

- A defendant with a criminal history I who is convicted at trial for committing arson, with the intent to conceal another crime, and where the arson "created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly," would only face a total offense level of 26, resulting in a Guideline range of 63-78 months. *See* U.S.S.G. § 2K1.4.

14

Despite the already seemingly overinflated Guidelines owing from the unique circumstances of this case that resulting in stacking of enhancements, the Government wants more. It says that a three-level upward enhancement is appropriate as analogous to the U.S.S.G. § 3A1.1 hate-crime or vulnerable-victim enhancement. But the Government overlooks the existing calculations. Civil servants "are not a recognized protected class" under that Guideline. [Gov't memo p. 21]. The PSR did, however, *already* give Mr. Dever a *six-point* enhancement because the offense was against government officials on account of their status. [PSR ¶¶ 49]; U.S.S.G. § 3A1.2(a)-(b). The Government wants to double count.

Further, insofar as the Government suggests that the Guidelines do not fully take into account the number of victims, undersigned counsel would note that the PSR applied both a 4-point multiple-victim enhancement, [PSR ¶ 84], *and* a two-point enhancement for multiple communications, [PSR ¶¶ 50, 57, 64, 70, 78]. The Government overlooks that latter enhancement.

### F. Avoiding Sentencing Disparities

Unfortunately, incivility has increased in political discourse in recent years. Beyond that, however, some misguided individuals have resorted to actual violence for political ends, most notably the Oath Keepers and those that entered the Capitol on

15

January 6.[4] As the Court considers avoiding sentencing disparities, the Court may wish to consider sentences handed out there, which caused 535 Senators and Representatives, plus their staff and Capitol police, to experience a level of fear likely far higher than the victims here. The sentences handed out there suggests the undue harshness of the Government's sentencing recommendation, and of even the currently calculated Guidelines. Consider, for example, the following:

*Following an eight-week trial*, Seth Rhodes received 18 years' imprisonment and Kelly Meggs received 12 years' imprisonment. *See* (Attached USDOJ Press Release). Here is how the Government summarized their misconduct:

---

[4] Mr. Dever attended the protest outside but did not participate in the riot. He thus has shown that he is capable at least of some good decision making.

> The defendants and their co-conspirators also collectively employed a variety of manners and means, including: organizing into teams that were prepared and willing to use force and to transport firearms and ammunition into Washington, D.C.; recruiting members and affiliates; organizing trainings to teach and learn paramilitary combat tactics; bringing and contributing paramilitary gear, weapons, and supplies – including knives, batons, camouflaged combat uniforms, tactical vests with plates, helmets, eye protection, and radio equipment – to the Capitol grounds; breaching and attempting to take control of the Capitol grounds and building on Jan. 6, 2021, in an effort to prevent, hinder and delay the certification of the electoral college vote; using force against law enforcement officers while inside the Capitol on Jan. 6, 2021; continuing to plot, after Jan. 6, 2021, to oppose by force the lawful transfer of presidential power, and using websites, social media, text messaging and encrypted messaging applications to communicate with each other and others.
>
> On Jan. 6, 2021, a large crowd began to gather outside the Capitol perimeter as the Joint Session of Congress got under way at 1 p.m. Crowd members eventually forced their way through, up, and over U.S. Capitol Police barricades and advanced to the building's exterior façade. Shortly after 2 p.m., crowd members forced entry into the Capitol by breaking windows, ramming open doors, and assaulting Capitol police and other law enforcement officers. At about this time, according to the government's evidence, Rhodes entered the restricted area of the Capitol grounds and directed his followers to meet him at the Capitol.
>
> At approximately 2:30 p.m., according to the government's evidence, Meggs, along with other Oath Keepers and affiliates – many wearing paramilitary clothing and patches with the Oath Keepers name, logo, and insignia – marched in a "stack" formation up the east steps of the Capitol, joined a mob, and made their way into the Capitol. Rhodes remained outside, directing and coordinating activities.
>
> While certain Oath Keepers members and affiliates breached the Capitol grounds and building, others remained stationed just outside of the city in quick reaction force (QRF) teams. According to the government's evidence, the QRF teams were prepared to rapidly transport firearms and other weapons into Washington, D.C., in support of operations aimed at using force to stop the lawful transfer of presidential power.

[*Id.* p. 2].

Cleveland Grover received a 28-month sentence for a written text (accompanied by actual preparations) that threatened shooting Nancy Pelosi on January 7. [*See* Attached USDOJ Press release]. According to the Government:

17

Case 1:22-cr-00072-MR-WCM    Document 160    Filed 08/21/23    Page 17 of 20

> WASHINGTON – A North Carolina man was sentenced today to 28 months in prison after earlier pleading guilty to a felony charge involving a threat he made to shoot House Speaker Nancy Pelosi.
>
> According to court documents, Cleveland Grover Meredith, Jr., 53, of Hayesville, N.C., traveled from Colorado to Washington D.C. and arrived late in the evening of Jan. 6, 2021, after the riots at the U.S. Capitol had ended. He had planned to arrive in Washington on Jan. 5 and attend various rallies. On Jan. 7, while at a hotel in Washington, D.C., he sent a text message to one of his relatives who was then in Georgia. The text message included a threat directed toward House Speaker Pelosi. The relative contacted Meredith's mother, who then contacted the FBI.
>
> The FBI located Meredith at a hotel approximately one mile from the U.S. Capitol on Jan. 7, and arrested him. He gave consent to search his phone, truck and trailer, which was physically present at the hotel. The FBI found a 9 mm semi-automatic firearm, an assault-style rifle with a telescopic sight, approximately 2,500 rounds of ammunition, and multiple large-capacity ammunition feeding devices inside the trailer. Meredith has been detained since his arrest.

[*Id.* p. 1].

*After a trial*, Michael Perkins was sentenced to 48 months for assaulting three Capitol police officers with a flagpole:

> Michael Steven Perkins, 40, of Plant City, Florida, was sentenced by U.S. District Court Judge Carl J. Nichols to 48 months in prison and 36 months of supervised release.
>
> Perkins was found guilty on March 15, 2023, of assaulting a federal officer with a deadly or dangerous weapon and civil disorder, both felony offenses. Perkins was also found guilty of offenses of entering and remaining in a restricted building or grounds, disorderly and disruptive conduct in a restricted building or grounds, and acts of physical violence while on the restricted Capitol grounds.
>
> According to evidence and testimony presented at trial, Perkins traveled to Washington, D.C., to attend the "Stop the Steal" rally on Jan. 6, 2021. When the rally concluded, Perkins marched toward the Capitol with a group of co-defendants, trespassing over the restricted perimeter that had been established, and made their way to the West Plaza of the Capitol building.
>
> Shortly after 2:00 p.m., Perkins helped a co-defendant in an attempt to charge and break through a police line by pushing him from behind into the line.
>
> As police descended into the crowd to assist another officer, Perkins picked up a flagpole and thrust it into the chest of an approaching officer. Perkins then raised the flagpole over his head and swung it down, striking two officers in the back of their heads.

[Attached USDOJ Press release].

Salvador Sandavol was sentenced to 88 months' imprisonment, after a trial, for conduct that involved assaulting multiple police officers on January 6:

18

> According to the government's evidence, Sandoval and his mother, Deborah, were present at the U.S. Capitol on January 6, 2021. Sandoval is seen on video stating, "We're at the State Capitol, or the U.S. Capitol." In a second video clip, Sandoval states, "Got pepper sprayed in the face and mouth…Got out cause I needed a break, and there's still people inside." The video then pans to the Capitol building, where dozens of individuals are draped in flags and chanting "USA, USA, USA!" in front of the Rotunda entrance.
>
> In surveillance video from inside the Capitol building itself, Sandoval is seen assaulting multiple law enforcement officers, including by pushing law enforcement officers who are clearly identified via insignias on their jackets and helmets. Sandoval and other rioters also grabbed the police shield of two additional MPD officers, attempting to pull the shield away from the officers. Sandoval and the other rioters were successful in prying away a police shield from one officer.

[Attached USDOJ Press release, p.1].

Setting those cases aside, it is difficult to find a case involving threats similar to this one, given its unusual facts. But undersigned counsel did discover the case of Garrett Santillo, from the District of Connecticut, who—despite being a Criminal History III and *two prior* convictions for sending threatening communications—was convicted in 2016 and sentenced to *probation*, with the consent of the Government, for sending a string of death threats to judges. *See* [Attached Gov't Sentencing Memo in *US v. Santillo*, 3:14-cr-194 (D. Conn.)].

## Conclusion

While Mr. Dever's conduct was criminal, it does not merit a Guidelines sentence in this case, much less the upward variance that the Government seeks. This Court should instead grant a downward variance from whatever the applicable Guideline range turns out to be.

Dated: August 21, 2023

Respectfully submitted,

TIMOTHY MICHAEL DEVER

s/Howard W. Anderson III
Howard W. Anderson III
N.C. Bar #50561

TRULUCK THOMASON LLC
3 Boyce Ave
Greenville, SC 29601
864-331-1751
howard@truluckthomason.com

# CERTIFICATE OF SERVICE

I, Howard W. Anderson III, certify that I filed a copy of the foregoing paper using the Court's CM/ECF system, which will deliver a copy to all counsel of record except for the following, whom I have this day served by U.S. Mail:

n/a – via CM/ECF

s/Howard W. Anderson III
Howard W. Anderson III
N.C. Bar #50561

20