**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

_____  )
UNITED STATES OF AMERICA,   )
                            )
             vs.            )      CASE NO. 1:22-CR-72-MR-WCM-1
                            )
                            )
TIMOTHY MICHAEL DEVER,      )
                            )
             Defendant.     )
_____   )
                            )
UNITED STATES OF AMERICA,   )
                            )
             vs.            )      CASE NO. 1:22-CR-72-MR-WCM-2
                            )
                            )
DARRIS GIBSON MOODY,        )
                            )
             Defendant.     )
_____   )

**THURSDAY, AUGUST 24, 2023**
**SENTENCING HEARING**
**HELD IN ASHEVILLE, NORTH CAROLINA**
**BEFORE THE HONORABLE MARTIN REIDINGER**
**CHIEF UNITED STATES DISTRICT JUDGE**

**MICHELLE A. McGIRR, RMR, CRR, CRC**
**Official Court Reporter**
**United States District Court**
**Asheville, North Carolina**

**APPEARANCES**:


<u>On Behalf of the Government</u>:

**DON GAST, Assistant U.S. Attorney**
**DAVID ANDREW THORNELOE, Assistant U.S. Attorney**
**Office of U.S. Attorney - Western District of North Carolina**
**233 U.S. Courthouse Building**
**100 Otis Street, Suite 233**
**Asheville, North Carolina  28801**




<u>On Behalf of the Defendants</u>:


(Timothy Michael Dever)

**HOWARD W. ANDERSON, III, Esquire**
**Truluck Thomason, LLC**
**3 Boyce Avenue**
**Greenville, South Carolina  29601**


(Darris Gibson Moody)

**EMILY M. JONES, Assistant Public Defender**
**MARY ELLEN COLEMAN, Assistant Public Defender**
**Federal Public Defenders - Western District of North Carolina**
1 Page Avenue, Suite 210
Asheville, North Carolina  28801



<u>USPO</u>:

**JENNIFER CALL**

1          (Thursday, August 24, 2023)

2                 **P R O C E E D I N G S**

3

4      (The defendant, Darris Gibson Moody, escorted into the courtroom

5                     at 1:53 p.m.)

6     (The defendant, Timothy Michael Dever, escorted into the courtroom

7                     at 1:53 p.m.)

8                 (Open Court at 2:00 p.m.)

9           THE COURT:  Good afternoon, everyone.

10                 (All say good afternoon)

11          THE COURT:  This afternoon we have two matters on the

12    docket both for sentencing.  One is United States v. Darris Gibson

13    Moody, which is before the Court for the sentencing of the defendant

14    pursuant to a plea of guilty on the charge of interstate threatening

15    communication in violation of 18 U.S.C., Section 872(c).

16          The other one is United States v. Timothy Michael Dever,

17    which is before the Court for the sentencing of the defendant on the

18    charge of aiding and abetting interstate threatening communications,

19    five counts, in violation of 18 U.S.C., Section 875(c) and Section

20    2.

21          Ms. Jones, good afternoon.

22          MS. JONES:  Good afternoon, your Honor.

23          THE COURT:  Is defendant Moody prepared to proceed this

24    afternoon?

25          MS. JONES:  Yes, your Honor.  Mrs. Moody is prepared to

1  proceed.

2          THE COURT:  Mr. Anderson, good afternoon to you.

3          MR. ANDERSON:  Good afternoon, your Honor.

4          THE COURT:  Is Mr. Dever prepared to proceed this

5  afternoon?

6          MR. ANDERSON:  We are, your Honor.  Thank you.

7          THE COURT:  Am I pronouncing it correctly?  Is it DE-VER

8  rather than DEV-ER?

9          MR. ANDERSON:  I think it's Dever like never, Judge.

10         THE COURT:  Dever, okay.  Pardon me for mispronouncing

11  it.

12         Mr. Gast, good afternoon to you.

13         MR. GAST:  Good afternoon, your Honor.

14         THE COURT:  Is the Government prepared to proceed?

15         MR. GAST:  We are, your Honor.

16         THE COURT:  Obviously having a joint sentencing hearing

17  is far out of the ordinary for all of us, but it was presented to

18  the Court that there were victims that are victims with regard to

19  both of these cases who apparently wanted to be here and also

20  present victim impact statements.

21         Therefore, what I would propose, in terms of the process

22  for going forward this afternoon would be to start first with Ms.

23  Moody's hearing, going through the completion of the Rule 11 and

24  then disposing of the issues regarding the pre-sentence report.

25         Then switching over to Mr. Dever to do those two steps

1  with regard to his hearing and then turning to any victim impact

2  statements.

3          Then picking up with arguments for the appropriate

4  sentence and allocution for Ms. Moody, then moving on to those same

5  two steps for Mr. Dever.

6          Mr. Gast, let me start with you.  Is there any objection

7  to proceeding in that manner or do you feel that there may be a

8  better way to go about this?

9          MR. GAST:  No, your Honor.  There are no objections.  The

10  clerk's office has been very good about telling us -- forecasting

11  for us what the Court had in mind and we think that's a good plan.

12          THE COURT:  Okay.  Ms. Jones, do you have anything you

13  wanted to offer with regard to that manner of proceeding?

14          MS. JONES:  No, your Honor.  No objection for Mrs. Moody.

15          THE COURT:  Mr. Anderson?

16          MR. ANDERSON:  No objection, your Honor.  My only request

17  would be after we finish with Ms. Moody, if I could have a few

18  minutes to talk to my client before we begin our portion.  I don't

19  know how long it's going to take, but I think that would be helpful

20  to have one or two minutes with him after we're done with the first

21  sentencing.

22          THE COURT:  Well, and at what stage are you talking

23  about?  Are you saying after we complete the issue regarding the PSR

24  for Ms. Moody when we move to your part, just on what I'm referring

25  to as phase I, phase II, you're wanting some sort of recess at that

1 point to talk to your client?

2          MR. ANDERSON:  After you finish phase II with Ms. Moody

3 and so we've completed sort of the pronouncement of judgment and

4 then it's going to be our turn to sort of start our presentation, if

5 I could have a few minutes.  I don't know if he's going to be out

6 here during all of this or if I could just talk to him in the back,

7 but before I guess -- before we begin our allocution, et cetera,

8 just to have a few minutes with him.

9          THE COURT:  Okay.  So after phase I, phase II for both

10 defendants, victim impact statements, then phase III and IV for Ms.

11 Moody, you want at least a brief recess at that point?

12          MR. ANDERSON:  Yes, Judge.

13          THE COURT:  Okay.  Now, you talked about after

14 pronouncement of sentence.  My intent would be to wait until we

15 finished all of that and then pronounce one sentence and then the

16 other sentence so...

17          MR. ANDERSON:  Then I may have misunderstood, your Honor.

18 But, again, before we get to his part to -- of allocution, I would

19 like to have a moment to discuss with him his allocution.

20          THE COURT:  Okay.  Well, depending on how long things

21 take, you may get an additional opportunity before then.

22          MR. ANDERSON:  Thank you, your Honor.

23          THE COURT:  Okay.  Turning first to Ms. Moody.

24          With regard to that matter, I have noted that there were

25 some objections to the pre-sentence report, one of which I think we

 1    probably will need to take up.

 2              I have reviewed the -- a sentencing memorandum submitted

 3    on behalf of the defendant along with a number of attachments.

 4    There's a sentencing memorandum that has been submitted by the

 5    Government along with a number of attachments; and then there was a

 6    subsequent additional victim impact statement; and then there is a

 7    motion for departure that has been filed by the Government.

 8              Are there any other items that have been submitted in

 9    anticipation of this hearing with regard to Ms. Moody?

10              MS. JONES:  There is nothing else to consider, your

11    Honor.

12              And at the appropriate time, I can clarify the status of

13    our objections, but I think we'll be withdrawing our outstanding

14    objection.  And I apologize if that wasn't clear in the sentencing

15    memo when I -- I think I said we're satisfied with the resolution.

16    I meant to say that we're withdrawing that remaining objection

17    regarding obstruction of justice.

18              THE COURT:  Okay.

19              Mr. Gast, anything further that has been submitted by the

20    Government in preparation for the hearing for Ms. Moody?

21              MR. GAST:  I don't think so.  There's one outstanding

22    motion to seal the Government made that I don't think has been ruled

23    upon, but that doesn't have a bearing on sentence but just wanted to

24    bring that up as a housekeeping matter.

25              THE COURT:  There were a couple of motions to seal

1  regarding both of these and written orders will be entered on those,
2  but offhand I don't think there's any problem with any of those.
3            Ms. Moody, I need for you to stand, please.
4            Do you recall appearing before the Magistrate Judge on or
5  about the 6th of January of this year for the purpose of entering a
6  plea of guilty in this case?
7            DEFENDANT MOODY:  Yes, your Honor.
8            THE COURT:  Do you remember being sworn in or placed
9  under oath at that time?
10           DEFENDANT MODDY:  Yes, your Honor.
11           THE COURT:  Do you remember answering the questions of
12  the Magistrate Judge?
13           DEFENDANT MOODY:  Yes, your Honor.
14           THE COURT:  Is it correct that at that time you signed a
15  plea inquiry form indicating that your answers were true and correct
16  at the time they were given?
17           DEFENDANT MOODY:  Yes, Your Honor.
18           THE COURT:  Were your answers, in fact, true and correct
19  when you answered the questions of the Magistrate Judge?
20           DEFENDANT MOODY:  Yes, your Honor.
21           THE COURT:  If I asked you all the same questions here
22  today, would your answers be the same?
23           DEFENDANT MOODY:  Yes, your Honor.
24           THE COURT:  Ms. Jones, were you in attendance at the Rule
25  11 hearing for your client?

1                    MS. JONES:  I was, your Honor.

2                    THE COURT:  Are you satisfied that she fully understood

3          the questions that were asked of her by the Magistrate Judge at that

4          hearing?

5                    MS. JONES:  Yes, your Honor.

6                    THE COURT:  Are you satisfied that she has fully

7          understood the questions that I've asked her here today?

8                    MS. JONES:  Yes, your Honor.

9                    THE COURT:  Ms. Moody, did you answer those questions the

10         way that you did and are you pleading guilty because you did, in

11         fact, commit the crime with which you are charged?

12                   DEFENDANT MOODY:  Yes, your Honor.

13                   THE COURT:  Is your plea of guilty the result of any

14         threat or force or promise, aside from the promises that are in your

15         plea agreement?

16          (The defendant, Darris Gibson Moody, conferring with Attorney Jones

17                         at counsel table briefly off the record)

18                   DEFENDANT MOODY:  No, your Honor.

19                   THE COURT:  Are you pleading guilty voluntarily?

20                   DEFENDANT MOODY:  Yes, your Honor.

21                   THE COURT:  In this case you've pleaded guilty pursuant

22         to a plea agreement.  In that plea agreement you have agreed and the

23         Government has agreed to certain facts and certain factors for

24         sentencing.  But under the law, I'm not required to accept those

25         facts or those factors just because both sides have agreed.  And if

1   I decline to accept any of those facts or factors in my sentencing

2   decision, that will not give you the right to withdraw your plea.

3   Do you understand that?

4           DEFENDANT MOODY:  Yes, your Honor.

5           THE COURT:  And is it still your plea to plead guilty in

6   this matter?

7           DEFENDANT MOODY:  Yes, your Honor.

8           THE COURT:  Based upon the representations made to the

9   Court and the answers given by the defendant at the Rule 11 hearing

10  before the Magistrate Judge, the Court finds, concludes and confirms

11  that the defendant's plea is knowingly and voluntarily made and that

12  the defendant understands the charges, potential penalties and

13  consequences of her plea.

14          Ms. Jones, does the defendant stipulate that there is a

15  factual basis to support her plea of guilty entered in this case;

16  and further, that the Court may accept the evidence as set forth in

17  the pre-sentence report, which includes the factual basis document

18  that was adopted at the Rule 11 hearing, as well as the Statement of

19  Relevant Conduct that has been submitted by the Government

20  thereafter, all as establishing such factual basis?

21          MS. JONES:  Yes, your Honor.

22          THE COURT:  Mr. Gast, does the Government so stipulate?

23          MR. GAST:  We do, your Honor.

24          THE COURT:  Based on the stipulation of the parties and

25  the evidence as set forth in the pre-sentence report, the factual

1  basis document and the Statement of Relevant Conduct, all of which

2  have been previously reviewed by the Court; and based upon the

3  defendant's admission of guilt, the Court finds, concludes and

4  confirms that there is a factual basis for the defendant's plea.

5          Accordingly, the Court confirms the Magistrate Judge's

6  acceptance of the defendant's guilty plea and this Court has

7  accepted and does accept the defendant's plea of guilty, finds the

8  defendant is guilty and enters thereon a verdict and judgment of

9  guilty.

10         Ms. Moody, there is a document that has been prepared by

11 the probation officer.  The document that I'm talking about, on its

12 front page on the upper left-hand side, has a caption that reads,

13 United States of America vs. Darris Gibson Moody.  Then on the upper

14 right-hand side of the page has a title that reads, pre-sentence

15 investigation report.

16         I see that your attorney is showing you a copy of that

17 document there at your table.  Have you seen this document prior to

18 today?

19         DEFENDANT MOODY:  Yes, your Honor.

20         THE COURT:  Have you had an opportunity to review it with

21 your attorney?

22         DEFENDANT MOODY:  Yes, your Honor.

23         THE COURT:  Do you understand the contents of that

24 document?

25         DEFENDANT MOODY:  Yes, your Honor.

1          THE COURT:  Ms. Jones, have you had an adequate

2    opportunity to review the pre-sentence report with Ms. Moody?

3          MS. JONES:  I have, your Honor.

4          THE COURT:  Are you satisfied that she understands the

5    contents of the pre-sentence report?

6          MS. JONES:  I am satisfied, your Honor.

7          THE COURT:  Okay.  Thank you.

8          Ms. Moody, you may take your seat.

9          Regarding the pre-sentence report, as I mentioned

10   earlier, there were some objections to the pre-sentence report that

11   were filed.  The one that I thought might still be for argument

12   pertained to one particular enhancement but, Ms. Jones, I understand

13   that that is being withdrawn.

14         Are there any other issues regarding the pre-sentence

15   report that we need to take up?

16         MS. JONES:  No, sir, your Honor.

17         THE COURT:  Any for the Government?

18         MR. GAST:  No, your Honor.

19         THE COURT:  Okay.  With that, the Court will accept the

20   pre-sentence report as written and based thereon, the Court will

21   find that the total offense level that applies in this case is level

22   19 and the Criminal History Category is category I.

23         That total offense level and Criminal History Category,

24   the Court will conclude, yield a Guideline range that calls for a

25   term of imprisonment between 30 and 37 months.

1          Ms. Jones, did I calculate that correctly?

2          MS. JONES:  Yes, sir, your Honor.

3          THE COURT:  Do you agree, Mr. Gast?

4          MR. GAST:  Yes, your Honor.

5          THE COURT:  The next thing I want to take up is the

6   Government's motion for a departure.

7          Mr. Gast, I have reviewed what you have submitted in

8   writing -- actually, I believe Mr. Thorneloe submitted it in writing

9   -- but do you want to supplement that here in court or are you

10  standing on your filing?

11         MR. GAST:  We're happy to stand on the filing and happy

12  to answer any questions the Court might have.

13         THE COURT:  Well, the Court has reviewed the Government's

14  motion for a downward departure and the Court will find in accord

15  with what has been submitted by the Government regarding this motion

16  and based thereon, the Court will find that the defendant has

17  provided substantial assistance in the investigation and prosecution

18  of others and that the nature and extent of such assistance warrants

19  a downward departure the equivalent of two levels.

20         Therefore, the Court will sentence in this matter with

21  reference to an offense level 17 rather than an offense level of 19,

22  which was based on the factors that are set forth in the

23  pre-sentence report and, therefore, will sentence with reference to

24  a sentencing range calling for a term of imprisonment between 24 and

25  30 months.

     1          Ms. Jones, did I correctly calculate the effect of a

     2     two-level downward departure?

     3          MS. JONES:  Yes, sir, your Honor.

     4          THE COURT:  Is there anything else that we need to

     5     address with regard to Ms. Moody's matter regarding either the

     6     pre-sentence report, Guideline range, before we move on to Mr. Dever

     7     for this portion?

     8          Anything else for the defendant?

     9          MS. JONES:  No, sir, your Honor.

    10          THE COURT:  Anything else for the Government?

    11          MR. GAST:  No, your Honor.

    12          THE COURT:  Okay.

    13          Now, with regard to Mr. Dever, in preparation for this

    14     hearing today, I have reviewed objections to the pre-sentence

    15     report.  And there are objections that have been filed on behalf of

    16     the defendant.  There was an objection filed by the Government.

    17          I have reviewed sentencing memoranda.  One filed on

    18     behalf of the defendant that includes letters of support and a

    19     report, and a sentencing memorandum that has been submitted by the

    20     Government, including various attachments and documents, but then

    21     also, thereafter, providing an additional victim impact statement.

    22          And then there was also an additional filing having to do

    23     with the identification of the victims by name and title that was

    24     filed under seal.

    25          Are there any other items, other than the motions to

seal, that have been submitted in anticipation of this hearing?

Anything for the defendant?

MR. ANDERSON:  No, your Honor.

THE COURT:  Anything for the Government?

MR. GAST:  No, your Honor.

THE COURT:  Mr. Dever, I need for to you stand, please.

Do you recall appearing before the Magistrate Judge on or about the 24th of March of this year for the purpose of entering a plea of guilty in this case?

DEFENDANT DEVER:  Yes, your Honor.

THE COURT:  Do you remember being sworn in or placed under oath at that time?

DEFENDANT DEVER:  Yes, your Honor.

THE COURT:  Do you remember answering the questions of the Magistrate Judge?

DEFENDANT DEVER:  Yes, your Honor.

THE COURT:  Is it correct that at that time you signed a plea inquiry form indicating that your answers were true and correct at the time they were given?

DEFENDANT DEVER:  Yes, your Honor.

THE COURT:  Were your answers, in fact, true and correct when you answered the questions of the Magistrate Judge?

DEFENDANT DEVER:  Yes, your Honor.

THE COURT:  If I asked you all the same questions here today, would your answers be the same?

1        DEFENDANT DEVER:  Yes, your Honor.

2        THE COURT:  Mr. Anderson, were you in attendance at the

3   Rule 11 hearing for your client?

4        MR. ANDERSON:  I was, your Honor.

5        THE COURT:  Are you satisfied that he fully understood

6   the questions that were asked of him by the Magistrate Judge at that

7   hearing?

8        MR. ANDERSON:  I am, Judge.

9        THE COURT:  Are you satisfied that he has fully

10  understood the questions that I've asked him here today?

11       MR. ANDERSON:  I am, your Honor.

12       THE COURT:  Mr. Dever, did you answer those questions the

13  way that you did and are you pleading guilty because you did, in

14  fact, commit the crime with which you are charged?

15       DEFENDANT DEVER:  Yes, your Honor.

16       THE COURT:  Is your plea of guilty the result of any

17  threat or force or promise, aside from the promises in your plea

18  agreement?

19       DEFENDANT DEVER:  No, your Honor.

20       THE COURT:  Are you pleading guilty voluntarily?

21       DEFENDANT DEVER:  Yes, your Honor.

22       THE COURT:  In this case you've pleaded guilty pursuant

23  to a plea agreement.  And in that plea agreement you have agreed,

24  and the Government has agreed, to certain facts and certain factors

25  for sentencing.  But under the law I'm not required to accept those

1   facts or those factors just because both sides have agreed.

2          If I decline to accept any of those facts or factors in

3   my sentencing decision, that will not give you the right to withdraw

4   your plea.  Do you understand that?

5          DEFENDANT DEVER:  Yes, your Honor.

6          THE COURT:  Is it still your plea to plead guilty in this

7   matter?

8          DEFENDANT DEVER:  Yes, your Honor.

9          THE COURT:  Based upon the representations made to the

10  Court and the answers given by the defendant at the Rule 11 hearing

11  before the Magistrate Judge, the Court finds, concludes and confirms

12  that the defendant's plea is knowingly and voluntarily made and that

13  the defendant understands the charges, potential penalties and

14  consequences of his plea.

15         Mr. Anderson, does the defendant stipulate that there is

16  a factual basis to support his plea of guilty entered in this case;

17  and further, that the Court may accept the evidence as set forth in

18  the pre-sentence report, which includes the factual basis document

19  that was adopted at the Rule 11 hearing, as well as the Statement of

20  Relevant Conduct that was submitted by the Government thereafter,

21  all as establishing such factual basis?

22         MR. ANDERSON:  Judge, we did have one wordsmithing

23  objection to the Government's additional Statement of Relevant

24  Conduct, but barring that, yes, we stipulate to the rest of it.

25         THE COURT:  That doesn't affect whether or not there is

1  any factual basis, does there?

2               MR. ANDERSON:  No, your Honor.

3               THE COURT:  Mr. Gast, does the Government so stipulate?

4               MR. GAST:  We do, your Honor.

5               THE COURT:  Based on the stipulation of the parties and

6  the evidence as set forth in the pre-sentence report, the factual

7  basis document and the Statement of Relevant Conduct, all of which

8  have been previously reviewed by the Court, and based upon the

9  defendant's admission of guilt, the Court finds, concludes and

10  confirms that there is a factual basis for the defendant's plea.

11               Accordingly, the Court confirms the Magistrate Judge's

12  acceptance of the defendant's guilty plea and this Court has

13  accepted and does accept the defendant's plea of guilty, finds the

14  defendant is guilty and enters thereon a verdict and judgment of

15  guilty.

16               Mr. Dever, there as document that has been prepared by

17  the probation officer.  The document that I'm talking about on its

18  front page has a caption on the upper left-hand side that reads,

19  United States of America v. Timothy Michael Dever.  Then on the

20  upper right-hand side of the front page has a title that reads,

21  pre-sentence investigation report.

22               I think I see that your attorney has placed a copy of

23  this document in front of you there at your table.  Have you seen

24  this document prior to today?

25               DEFENDANT DEVER:  Just today, your Honor.

1          THE COURT:  Well, prior to this proceeding here this

2    afternoon, have you had an opportunity to review this document?

3          DEFENDANT DEVER:  Yes, your Honor.

4          THE COURT:  Have you had an opportunity to review it with

5    your attorney?

6          DEFENDANT DEVER:  Yes, your Honor.

7          THE COURT:  Do you understand the contents of this

8    document?

9          DEFENDANT DEVER:  Yes.

10          THE COURT:  Mr. Anderson, have you had an adequate

11    opportunity to review the pre-sentence report with Mr. Dever?

12          MR. ANDERSON:  I have, your Honor.

13          THE COURT:  Are you satisfied that he understands the

14    contents of the pre-sentence report?

15          MR. ANDERSON:  I am, your Honor.

16          THE COURT:  Okay.  Thank you.

17          Mr. Dever, you may take your seat.

18          With regard to the pre-sentence report, as I mentioned

19    before, there are some objections to the pre-sentence report that

20    are yet to be disposed of.

21          The first one that I want to address, Mr. Anderson, is

22    one that you have submitted and that is -- I'm needing to look for

23    what paragraph it is in.  Paragraph 49 is the first time it appears.

24    It appears in each one of the counts, but it's the same in all of

25    them.  The six-level enhancement for conduct evidencing an intent to

1  carry out the threat.

2       You have objected to that enhancement as it pertains to

3  each of the counts of conviction.  Do you wish to be heard on that?

4       MR. ANDERSON:  Judge, just briefly.  Again, because this

5  is an enhancement, the Government bears the burden of proof.

6       From what I understand from the Government's position in

7  the case, there certainly was a lot of talk and there was a lot of

8  talk, and I agree it was a lot of inappropriate talk, but I didn't

9  see any actual preparations to arrest anyone, to kidnap anyone, to

10 do anything like that.  Things like casing someone's home, having a

11 stash of guns or a stash of handcuffs.  So I just don't know that

12 there's actually any real evidence of an intent to carry out.

13      And as I noted in the sentencing memo, you see some of

14 those Telegram channels where one of them says, well, we've been

15 waiting for five or six years for this to happen, but no arrests

16 have taken place.  So, again, we have -- according to the Government

17 -- lots and lots and lots of talk, but I don't know beyond speech

18 that we ever got to anything that would suggest a real intent to

19 have the plan carried out and have anyone actually arrested

20 unlawfully.

21      So I just don't think the Government has sustained its

22 burden of proof on that, Judge.

23      THE COURT:  Okay.  Thank you.

24      Mr. Gast, what says the Government?

25      MR. GAST:  Thank you, your Honor.

 1          We believe the probation officer correctly assessed that

 2   six-level enhancement and we ask the Court to find it.

 3          The standard under the Guidelines is any conduct

 4   evidencing an intent to carry out the threat.  To be clear, the

 5   standard is not that we have to show that Mr. Dever himself was

 6   going to go out with handcuffs and arrest people.  In fact, the

 7   threat here, in essence, was that public officials needed to resign

 8   or else the people, quote/unquote, will come and arrest you and that

 9   PBI -- and that being Mr. Dever -- would pay them for doing so.  He

10   performed multiple overt acts in furtherance of that plan to support

11   the enhancement.

12          This notion that it was just talk is, well, nonsense,

13   when you look at all the things that he did.  First he launched an

14   organization complete with hats and complete with their own currency

15   in support of this organization.  He provided a website with

16   instructions and document and training, including a place on that

17   website for people serving the writs to dox the victims and place

18   their personal identifying information out there so that would-be

19   bounty hunters would have that information to know who was ripe for

20   arrest.

21          He did live Q/A sessions -- in fact, Ms. Moody attended

22   some of these sessions -- where, over Telegram, where they discussed

23   how this plan would be implemented.  Then rented a post office box

24   in Kingsland, Texas, where they directed that the documents would be

25   taken.  They raised money to hire agents and to pay bounties.  They

posted bounties for over 900 victims in 32 states and then doxed them.

And at that point, once that's done, your Honor, it's out in the world. At this point, it's no longer limited to PBI insiders. At that point anybody who reads this and is foolish enough to believe that it's true could have then gone out and acted upon it and then called upon Mr. Dever to pay the bounties.

In addition to that, your Honor, there's evidence in the PSR this was not just talk -- I'm referring to paragraph 15 in particular -- where -- which references some of the things they're specifically posted on the Telegram site and pinned at the top so that the moderator, in this case Mr. Dever, would draw new users' attention to this, to study this part in particular, where he said things like, it's round-up time, and things like, I have a lot of guys there just waiting to start these arrests and collect that money.

They even went into specifics about how there would be arrest teams and -- that numbered -- arrest teams of 12 and that nearly 500 were ripe for arrest.

I would also draw the Court's attention to the video that we submitted to the Court in advance of the hearing. The title certainly is illustrative of our point, which is this YouTube video was called, how to lawfully arrest a sheriff, a judge, a president, a governor, a mayor, a Congressman, Fauci, Gates, media CEOs. All are convicted in the highest court of the land. And it was a long

1    video.  It was an hour and 17 minutes.  That's why we submitted it
2    to the Court in advance.
3              I'm not going to go through all the things that we allege
4    unless the Court wants me to cite some, but repeated over and over
5    and over references through that video indicating that this was not
6    satire, this was not a joke, this was not aspirational, but telling
7    the followers of his channel that if they served these writs and
8    then after 30 days, if they don't do what they've been directed to
9    do, the victims, that you may begin arresting people and we will pay
10   you 10,000 or 20,000 depending on whether they were bar attorneys or
11   not.  So over and over they said this.
12             Now, in the objection, the defendant cites to several --
13   hand-picked several individual messages that would seem to indicate
14   that the arrests were not imminent.
15             I would note a couple of things about that.  One is that
16   all of those messages were from now deceased co-defendant, Dee
17   Thomas Murphy.  Those were not statements from Mr. Dever and those
18   things cited in the objection really only say that we are not
19   imminently going to arrest them, but that this is part of the
20   process to get that done.
21             So I would submit to the Court that we have amply shown,
22   through the PSR and items submitted to the Court, that this was not
23   a joke, this was not satire.  And once it left the hands of the PBI,
24   again, anyone out in the world with an AR-15 and a will to make
25   10,000 or $20,000 could have acted upon this and at that point it

1    would have been out of Mr. Dever's hands.

2              So once it's delivered into the world, the risk that

3    someone would follow through means that we've met that standard.

4              THE COURT:  Mr. Anderson, do you have anything else you

5    want to say --

6              MR. ANDERSON:  Thank you, Judge.  Just briefly.

7              I think it is relevant sort of what these messages are.

8    Certainly the threats were real, which is why he's pleaded guilty,

9    he's accepted responsibility for that.  And what we're trying to

10   figure out, yes, this was a threat, but is it -- are we actually

11   going to carry it out?

12             And we've got lots of messages pinned up at the top from

13   D. Tom Murphy, who's, you know, in some sense, sort of the brain

14   child of a lot of this saying, we're not involved in arresting

15   people.  We're not doing it yet.  We've been waiting for a long

16   time.

17             And, again, Judge, according to the Government, this went

18   on for a long time.  So I think their position would be a lot

19   stronger if this whole thing lasted three or four days, but we've

20   got a long period.  And I know there's certainly a risk that

21   somebody out there could have found this stuff and then did

22   something about it.  Somebody who wasn't sort of mentally stable,

23   found it and then decided to sort of not follow what -- these items

24   here, that we're not arresting people yet.

25             I'm not at all downplaying the risk, but we have to

separate the risk that somebody might have done that from, did Mr.
Dever intend for someone today or tomorrow or a week from now to go
and actually carry this out. Either him personally or Ms. Moody,
who's the other person charged in this case, or Mr. Murphy. And I
don't think there's any evidence about any actual imminent plan.
Again, a lot of talk about a lot of things but no real actual plans.

And I don't think the Government has sustained its burden
of proof so I would ask you to withdraw the enhancement. Obviously
it's relevant for 3553(a) sort of regardless as to how the
resolution is resolved. But, again, I don't think under the
Guidelines, the Government has sustained its burden here, Judge.

THE COURT: Well, with regard to this enhancement, first
of all, under 2A6.1(b)(1), it doesn't need to be conduct evidencing
the intent that the person charged would individually carry out the
threat, but merely evidencing an intent for the carrying out of the
threat.

So then it needs to be a matter of examining what it was
that the defendant did pursuant to the threat. In other words, in
addition to merely making the threat. And here, what the Government
relies on is the fact that in addition to the threat, there was the
publication of the individuals who were threatened, information
about where they can be found and then the posting of the
information regarding the bounty.

Further, the information whereby not only people within
the organization -- it was not -- that the threat was not limited

within the organization, but was essentially broadcast to anybody

who would either go by the post office and look at the posting or

look on the Internet and there was no limitation on that.

And I believe that that -- by essentially letting that

out of the barn door, setting in motion what could be the carrying

out of the threat by posting that with the bounty to the general

public is sufficient to carry the Government's burden that it was

conduct that evidenced an intent for the threat to be carried out,

whether that be by someone else other than the defendant, and,

therefore, the objection to the enhancement is overruled.

The next matter that we need to take up, Mr. Anderson,

you had an objection to -- and I need to look at what paragraph this

is.

DEFENDANT DEVER:  Excuse me, your Honor.  I'm gonna have

to dismiss my attorney or I'm gonna have to explain that -- that

feature on the website.  There was not a list, your Honor, of any

people --

MR. ANDERSON:  Mr. Dever --

THE COURT:  Mr. Dever, you have an attorney.  There's a

portion of this proceeding where you will have an opportunity to

address the Court, but with regard to the legal matters, you need to

speak through your attorney.  That's the way this works.

DEFENDANT DEVER:  But he's not explaining that --

THE COURT:  Well, then if we need to, we'll take a break.

You can talk to him and make sure that he is fully apprised as to

what he needs to know, but there can't be this tag team between the two of you that he says one thing and then you say something else.

So are you saying that you need to take a recess in this proceeding so that you can talk to your attorney?

DEFENDANT DEVER:  Yes, your Honor.

THE COURT:  Is this something that you can do just having a short discussion between the two of you there at your table or do we need to have a recess and that you need to talk to him back in the lock up?

(Attorney Anderson and the defendant, Timothy Michael Dever, conferring at counsel table briefly off the record)

MR. ANDERSON:  Judge, at the moment he's making noises about wanting to be *pro se*.  I think we probably should have me talk to him there in the back and see if I have to make a motion for you to deal with, but I would say it's probably better to have me go talk with him back in the cell block back there.

THE COURT:  Is this something that you believe that we need to take a recess and you're going to be back there a while or we can just wait for you after the two of you have a discussion outside of the room?

MR. ANDERSON:  Judge, I don't think there's a lot we need to talk about.  I mean, again, he may want me to make a motion to withdraw that you would then rule upon.  I'm aware of the things that he wants me to say and later in the process we'll be able to talk about some of those things.  Right now we're dealing with legal

```
 1  matters under the Guidelines, which are sort of different than
 2  3553(a).
 3          But, again, he's made a request to talk about possibly
 4  going pro se and so I think I probably should talk with him about
 5  that and see if I have a motion.
 6          THE COURT:  Well --
 7          DEFENDANT DEVER:  I'm going to have to find a different
 8  attorney, your Honor.
 9          THE COURT:  Well, right now, Marshal, if you would go
10  ahead and take Mr. Dever back into the lock-up and allow Mr.
11  Anderson to go back there with him so they can have a relatively
12  brief discussion.
13          We're just going to wait in here for you.  If this is
14  going to take a while, if you can just somehow let us know --
15          MR. ANDERSON:  Yes, your Honor.
16          THE COURT:  -- and then we'll take a recess to wait.
17          MR. ANDERSON:  Thank you, Judge.
18  (The defendant, Timothy Michael Dever, escorted out of the courtroom
19                          at 2:37 p.m.)
20      (Attorney Anderson exiting the courtroom at 2:37 p.m.)
21      (The Court at ease commencing at 2:37 p.m. and concluding
22                          at 2:42 p.m.)
23   (The defendant, Timothy Michael Dever, returned to the courtroom
24                          at 2:42 p.m.)
25      (Attorney Anderson returning to the courtroom at 2:42 p.m.)
```

```
 1                    (Open Court at 2:42 p.m.)
 2              MR. ANDERSON:  Thank you, your Honor.
 3              At this time we're prepared to proceed and I have no
 4    motion to make.
 5              THE COURT:  And --
 6              MR. ANDERSON:  I have no motion to make so I'm going to
 7    proceed on as counsel.
 8              THE COURT:  Okay.  Next matter that I want to take up
 9    pertains to the next objection filed on behalf of the defendant and
10    that pertains to the four-level enhancement that was included,
11    beginning in paragraph 52.  It is repeated in each of the
12    calculations regarding each of the counts.
13              Mr. Anderson, I'll -- and that pertains to the four-level
14    enhancement under 3B1.1(a) regarding a leadership role within the
15    offense.  I'll hear from you.
16              MR. ANDERSON:  Thank you, Judge.
17              I mean, again, I think this turns on the application
18    notes to the Guideline.  We're trying to decide was Mr. Dever a
19    leader organizer of the offense and so to do that, we have to figure
20    out who the participants in the offense are.  And so I think that
21    we're looking at these five counts here, which as far as I
22    understand it, is Ms. Moody and Mr. Dever --
23              THE COURT:  Let me stop you for a second because if we're
24    talking about the offense conduct, you're not just talking about the
25    five counts of conviction.
```

 1          So are you narrowing your argument too narrowly with

 2     regard to this issue of the enhancement?

 3          MR. ANDERSON:  Well, Judge, under the Guidelines, each

 4     victim is going to be grouped separately under the Guidelines and so

 5     we're looking at -- you know, if there are 45 victims, we have 45

 6     different buckets and I think for each of those buckets we need to

 7     know who the participants are in that item there.

 8          And under the application notes, I think that the only

 9     participants here are going to be Ms. Moody, Mr. Dever and Mr.

10     Murphy.  And so I don't see that he falls within the meaning of a

11     leader within the meaning of the application notes.  He's not on

12     trial -- or he's not convicted of being in the PBI.  We're talking

13     about the offense and who the participants are in the offense and I

14     just don't think that all these other things, the fact that there

15     were other people who were posting in the PBI channel -- again,

16     those might be relevant to other victims, but for any of the

17     offenses in this case, because each victim is sort of one defense, I

18     think that we're -- that there are not a sufficient number of people

19     for the Guideline to apply.

20          Of course, it's relevant for 3553(a) purposes, regardless

21     as to how the Court stacks it, but for the purposes of the

22     Application Notes 1 and 2, I just don't think that the Government

23     can show that there are a sufficient number of participants in the

24     offense.

25          Thank you, Judge.

 1          THE COURT:  What I want you to address -- because the

 2     language under 3B1.1, for instance under sub-part (a), which is the

 3     one that would apply here, if the defendant was an organizer or

 4     leader of a criminal activity.  It doesn't say of the count of

 5     conviction.  So in other words, if the count of conviction is one

 6     small slice of a broader criminal activity, doesn't the language of

 7     3B1.1(a) cause this to be applied with regard to the broader

 8     criminal activity?  And if it doesn't, how do you arrive upon that

 9     point?  That's what I want you to address.

10          MR. ANDERSON:  Judge, I think that because this is an

11     aiding and abetting offense as opposed to actually convicting the

12     offense -- and, again, as I understand what happened, Mr. Dever and

13     Mr. Murphy sort of made these statements on YouTube and Telegram.

14     People like Ms. Moody then decided to serve writs on people sort of

15     on their own without sort of coordinating with the mother ship or

16     anything like that.

17          And so when -- I think that for him to aid and abet

18     anybody -- I mean, one, he's responsible because Ms. Moody sort of

19     followed his direction, but I don't think that the offense conduct

20     is aiding and abetting.  But, again, who was being aided and abetted

21     is going to be one person for one victim and I just don't think that

22     -- again, this is a very unusual case, Judge, and I haven't found

23     any case law that would speak to this directly, you know, but this

24     is just a very unusual case as you saw from the sentencing memo.

25     But as I read the application notes, I just don't think that the

Government met its burden of proof in that regard because this is
decentralized organization.  It's not, you know -- it's not like
your typical drug cartel or something like that where there's
hierarchy and people are following orders from the top.  I just
don't think that that's sort of what's going on here.

He shouldn't have put this stuff out there on the
Internet, no dispute about that, but I just don't think that there
are participants for the offense within the meaning of Application
Note 2.

THE COURT:  Maybe I'm just not listening to you carefully
enough, but I don't think you answered my question.  Because, again,
it talks about -- even where it talks about participants, it's
participants in the criminal activity, not in the count of
conviction.  And as you narrow it down to -- well, it's aiding and
abetting.  It's aiding and abetting one particular person causing a
threat to one particular victim.  That's not what's alleged in this
case.

I mean, yes, that's what's alleged in one particular
count, but where it uses the much broader term "criminal activity,"
how is it that you logically get to the conclusion that the criminal
activity is limited not only to the broader criminal activity and
not only to the general offense conduct, but specifically to the
defendant's participation within that one count of conviction?  How
do you get it narrowed down to that?  I'm not following.

MR. ANDERSON:  So, Judge, for me, because the Guidelines

1  say that we have to -- that we're not allowed to group separate

2  victims together in this case.  And, again, he's not on trial for a

3  drug conspiracy where there is an organization here.  I mean --

4          THE COURT:  Can I stop you for a second.  Are you relying

5  entirely upon this non-grouping?

6          MR. ANDERSON:  Yes, Judge.  And if your Honor disagrees

7  with me about that, then I can sit down.  But that's really what I'm

8  saying is under the Guidelines, that we have to view each one --

9  whether it's 45 groups or 100 groups, we're looking at who were the

10 participants in the offense, because that's what the application

11 notes say.  And because we can't group them, I don't think that we

12 ever get to a sufficient number of participants.

13         But I don't know that I have anything more to add beyond

14 what I've said, Judge.

15         THE COURT:  Well, that answers my question.  So I

16 appreciate you -- because I noticed that you said that earlier, but

17 I did not focus on that being the cornerstone of your argument.  But

18 thank you.

19         MR. ANDERSON:  Thank you, Judge.

20         THE COURT:  Let me turn back to Mr. Gast.

21         MR. GAST:  Thank you, your Honor.

22         First of all, yes, I think the defense argument is too

23 narrow, that the term "criminal activity" includes all the relevant

24 conduct.

25         With respect to the specific argument that the defense

1  counsel makes about grouping unit increases, those are apples and
2  oranges in the Guidelines.  The grouping unit increases just talk
3  about how many times you calculate whether you should add for having
4  multiple victims.  That has nothing to do with the concept of
5  relevant conduct.  So in this case, the Court should -- can and
6  should look at all the relevant conduct.
7          Your Honor, I've seen this enhancement applied many times
8  over the years.  This is probably the first time I've seen where the
9  person to whom this enhancement is assessed actually formed an
10 organization.  He formed an entity, the PBI.  He promoted it, he
11 recruited for it, he named it, he created a website for it.  You
12 know, we see this enhancement applied all the time in drug
13 conspiracies and things of the like where, of course, none of those
14 things are done.
15         So in this case, certainly it's amply proved.  Not only
16 did he form an organization, quite literally he's selling
17 merchandise for it.
18         But in terms of the actual Guideline, your Honor, there's
19 actually two different prongs and I would submit that he would -- it
20 should be applied to him either under either or both prong.
21         The first is the participant's prong where he has to have
22 five or more participants, including himself.  And, of course, there
23 are many, many more than five.  We don't know exactly how many, but
24 there's 4,000 people that subscribed to the Telegram channel.  There
25 have been 900 people served with these writs -- more than 900 -- in

1   32 different states.  There is, of course, the three defendants in

2   this indictment.  There's all the moderators on the website so --

3   all of whom would have criminal culpability here.

4           Ms. Moody talked about helping other people serve writs

5   so -- but there's also the otherwise extensive prong.  And for that

6   one, you don't even have to have -- if you look at Application Note

7   4 -- I'm sorry, 3, that includes all persons involved in the course

8   of the entire offense should be considered, even if they're not

9   individually culpable.

10          So the example it gives in Application Note 3 is a fraud

11  that involved only three participants, but used the unknowing

12  services of many outsiders would be considered extensive.

13          So there's two different ways the Court could weigh it.

14  I would submit that there's more than five participants in the PBI

15  so I think the participants' prong would apply.

16          But even if it didn't, even it was just the three

17  defendants named in the indictment, they certainly used and referred

18  to and drafted and recruited and trained many, many, many more than

19  that.  And their organization is national in scope.  It's across 32

20  states so far so I think that there's little question that the

21  enhancement applies.

22          THE COURT:  Okay.  Thank you.

23          Mr. Anderson, do you have anything else you want to say?

24          MR. ANDERSON:  Judge, I would note that at least to Mr.

25  Dever's mind, you know, the PBI -- I don't know that he would

necessarily agree that he established it. I think you saw one of those posts there, that he seems to have viewed it as he more discovered it, sort of God-created. And, again, this is not your typical drug conspiracy or RICO organization.

And I just think that the makers of the Guidelines didn't have this case in mind in a whole lot of ways so I would just stand on what I've said previously, Judge.

Thank you.

THE COURT: Okay. I see the determination of this objection as hinging on the way to construe the term "criminal activity" in 3B1.1(a). Well, it's actually in every subsection of 3B1.1.

The defense argument is the term "criminal activity" is actually a very narrow term that where the counts of conviction cannot be grouped or should not be grouped, that it is limited to the count of conviction, whereas the Government's contention is that criminal activity is as broad as the offense conduct, and possibly even broader than that, as particularly underscored by Application Note 3.

The way I construe this is if 3B1.1 meant to limit that to the activity of the count of conviction, it would have said so. The Guideline uses the broadest possible term here, that being the term "criminal activity." It's even broader than offense conduct by the nature of the terminology. Therefore, I have trouble seeing the narrow interpretation that is advocated by defense counsel.

 1          Taking that into account, the criminal activity is

 2    actually here very broad.  It is the use of these documents and the

 3    posting of this material.  The reaching out to even unknown persons

 4    regarding the offense conduct and that involved a number of people

 5    and certainly was otherwise extensive.  As pointed out in the record

 6    at length, it involves some 32 states.

 7          And in many respects, the defendant here, Mr. Dever, was

 8    the hub of the wheel.  He may not have been the one who founded the

 9    organization, but he certainly was in the middle of that

10    organization; that he did a great deal regarding organizing it and

11    directing it and leading it.  And, therefore, it -- the objection is

12    overruled because I believe that the enhancement does apply under

13    these circumstances.

14          Mr. Anderson, those are the only two objections that you

15    had that appear to me to still require some sort of need to be

16    addressed as part of this proceeding.

17          Do you have any anything else from the pre-sentence

18    report that we need to address?

19          MR. ANDERSON:  Yes, Judge.

20          It's one correction that Mr. Gast and I discovered, I

21    guess it was maybe Monday as we were getting the case ready.  The

22    enhancement for Counts Three and Four for the -- which one is it --

23    involving the governmental victim.  Counts Three and Four don't

24    involve a governmental victim.  It won't change the ultimate

25    Guideline range for grouping purposes.  Instead of each of Counts

Three and Four counting as one unit, they'll count as a half unit.
So it won't actually change the ultimate Guideline range, but the
offense conduct for Counts Three and Four is going to be lower
because they were not actual government employees.

THE COURT: And I was aware of that. I saw that.
Paragraph 65 does have the six-level enhancement regarding
governmental official. Paragraph 72 has that same enhancement
whereas those two counts of conviction do not pertain to
governmental officials and, therefore, that six-level enhancement
should not apply with regard to each of those.

Therefore, with the calculation that is made in paragraph
83 for the multiple-count adjustment, Count Three -- since that
adjusted offense level would now be six levels below, it only
provides half a unit as does Count Four. Therefore, the total
number of multi-count units is four rather than five. However, that
does not change the ultimate enhancement regarding the multi-count
calculation in paragraph 85. Therefore, it has no effect on the
calculation of the Guideline range, but the statement of reasons
will reflect that correction to the pre-sentence report.

Anything else, Mr. Anderson?

MR. ANDERSON: No, your Honor.

THE COURT: Mr. Gast, you had an objection as well. That
one pertains not to an enhancement that is there, but an enhancement
that you contend should be there but is not under 3C1.1 for
obstruction.

1          I'll hear from you.

2          MR. GAST:  Yes, your Honor.

3          And I'll be very brief because my filing really says all

4   of it but -- and I certainly recognize there is, you know, freedom

5   of speech and a freedom of protest and those things should be

6   protected.  The Government sees to it that those things get

7   protected, but what the defendant proposed was different than that.

8          I mean, even in a protest if there was picket lines, if

9   the defendant wanted to recruit people to picket in front of the

10  courthouse.  Even under that circumstance, they would be directed to

11  be in a place where they were not obstructing entry to the

12  courthouse or affecting the business of the court.

13          This is different though.  The defendant recruited people

14  with an eye towards having them -- and he said it in several

15  different versions -- he said it in a video he put out from Mr.

16  Moody's living room, he did it in Telegram posts that are attached

17  to my objection and are already in the PSR; that his goal was to

18  have truckers come and blockade the jail so that people couldn't get

19  in and out and so that they would release the prisoner of war, is

20  what was stated on more than one occasion.

21          That is interfering with the Court's function.  And what

22  I would submit to the Court is because the enhancement allows --

23  permits for attempts, it's of no moment that he did not succeed.

24          So in this case, I would submit to the Court that

25  certainly if he had succeeded and trucks did blockade the jail and

1  we were unable to remove Ms. Moody and bring her from the jail to
2  the courthouse, that would be obstructing justice and the
3  enhancement permits that in an attempt.

4         So the question is:  Did the defendant attempt to do
5  that?  He was very explicit in what he wanted done.  And much in the
6  same way as when he doxed the victims, he put those bounties out
7  into the world.  Similarly when he puts out videos promoting this,
8  when he puts out multiple posts on Telegram saying, we need the
9  truckers to come up, we need to shut down the town, we need to
10  blockade the jail and demand the release of the prisoner.  That is
11  attempting to obstruct the function of the court.  Now, it was
12  fortunate for everyone involved that that did not happen, but he
13  tried to make it happen.

14         And so, therefore, the obstruction of justice enhancement
15  should apply since it covers attempts.

16         THE COURT:  Okay.  Thank you.

17         Mr. Anderson.

18         MR. ANDERSON:  Thank you, Judge.

19         Again, here I would agree with probation.  Obviously we
20  are talking about freedom of speech.  And as I noted in my response
21  to the Government's objection, we are looking for imminent threats
22  of violence.

23         I would disagree with Mr. Gast this even qualifies as an
24  attempt.  What I heard was a lot of words, but I don't know that
25  words themselves are an attempt.  I think attempt requires an overt

1    act and I just don't know that we've gotten that.

2           There's the issue about -- that Mr. Dever hadn't even yet

3    been charged in this case so he's, you know, not even yet a

4    defendant in this case.

5           And I would stand on my response and on the probation

6    officer's concurrence with my response.

7           THE COURT:  I think this particular objection raises a

8    very interesting question as to what constitutes an attempt and can

9    mere words constitute an attempt.

10          It is undisputed in the record that even if this were an

11    attempt, it was a wholly unsuccessful attempt because none of it,

12    not even a portion of it, materialized.  And, therefore, I think

13    that the words used can be construed as hyperbole and that,

14    therefore, as -- in the rule of lenity, that mere hyperbole cannot

15    rise to the level of an attempt, therefore, I will overrule the

16    objection.

17          As with all of my rulings regarding the objections on the

18    calculations of the Guidelines though, that is without prejudice to

19    any argument regarding variances, departures, appropriate sentence

20    for the imperfect application of any of these particular

21    enhancements, but I will overrule that objection.

22          Are there any other issues regarding the pre-sentence

23    report that we need to address regarding Mr. Dever?

24          MR. ANDERSON:  Not at this time, Judge.

25          THE COURT:  Anything for the Government?

1              MR. GAST:  No, your Honor.

2              THE COURT:  With that, the Court will accept the

3      pre-sentence report as written, except for the items that I

4      mentioned earlier regarding paragraphs 65, 72 and 83.

5              With that, the Court will find the total offense level in

6      this case is level 31 and the Criminal History Category is category

7      I.

8              Based on that total offense level and Criminal History

9      Category, the Court will conclude as a matter of law that the

10     Guideline range that applies in this case calls for a term of

11     imprisonment between 108 and 135 months.

12             Mr. Anderson, did I calculate that correctly?

13             MR. ANDERSON:  Yes, your Honor.

14             THE COURT:  Do you agree, Mr. Gast?

15             MR. GAST:  Yes, your Honor.

16             THE COURT:  Mr. Gast, what is the situation with regard

17     to the victims who wish to be heard?

18             MR. GAST:  Your Honor, we have four victims present here

19     that would like to address the Court.  Mr. Thorneloe has spoken to

20     them about, you know, how that would proceed.  I'm going to yield to

21     him to let him call them up if this is the appropriate time for

22     that.

23             THE COURT:  Is there anything that we need to address

24     before we move on to the victim impact statements?

25             MR. GAST:  Not from the Government, your Honor.

```
 1                    THE COURT:  Anything for either of the defendants?
 2                    MS. JONES:  No, sir, your Honor.
 3                    MR. ANDERSON:  No, your Honor.
 4                    THE COURT:  Okay.  Well, proceed and call the first
 5       victim up.
 6                    MR. THORNELOE:  Thank you, your Honor.
 7                    First we have Ms. Julia Boyd-Freeman and she would like
 8       to come forward.  She's one of the victims in the case and she'd
 9       like to present her statement.
10                    THE COURT:  Please come forward.  Stand there next to Mr.
11       Thorneloe.
12                    And, again, I wanted to reiterate, this is the
13       opportunity for the victims to make a statement to the Court about
14       how these crimes have impacted them, it's not an opportunity to play
15       lawyer or to argue for any particular sentence or anything like
16       that.  It is to provide information to the Court about the impact
17       that this has had on the victims.
18                    So please state your name for the record and then you may
19       proceed.
20                    MS. BOYD-FREEMAN:  Julia Boyd-Freeman.  It's B-O-Y-D
21       F-R-E-E-M-A-N.
22                    Thank you, your Honor, and members of the court for
23       allowing me to speak today.
24                    This crime has deeply impacted my life, the lives of my
25       family, friends and co-workers.  That fateful Saturday in July 2022
```

1   I will never forget.  A friend called and said there was a warrant

2   against me posted in the post office in Waynesville, along with

3   other elected officials, judges and law enforcement officers.

4         At first I thought it was a joke.  That was until I

5   contacted our local sheriff's department who said it was not a real

6   warrant, but definitely a real threat.

7         I've been an elected official for nearly 12 years and the

8   Director of Haywood County's Domestic Violence and Sexual Assault

9   Agency for 26 years.  I've been called names, I've been threatened

10   by abusers, but never nothing -- anything to this extent.

11         To this day I live in fear.  As things developed and as

12   threats of a bounty and possible kidnapping emerged and the FBI

13   contacted me, that confirmed that fear.  All of my addresses were

14   posted on the Internet, including the confidential location of my

15   agency's domestic violence emergency shelter for battered women and

16   children.

17         During those several months prior to any arrests being

18   made, my family, friends and co-workers became hypervigilant and

19   coming up with ways to protect me, including offering to hide me in

20   a secret location.

21         To this day, the psychological damage is real.  I am now

22   always looking over my shoulder.  I don't go out nearly as much as I

23   did and any vehicle unknown to me that comes up my driveway puts me

24   in a panic.

25         I thought long and hard about speaking today.  Would I

once again become a target?  But I thought how for 26 years I've asked domestic violence and sexual assault victims to stand up against those who have harmed them.  So I stand here to say I have been harmed, but I am not broken and knowing that justice will be served.

Thank you, your Honor.  Thank you, members of the court.

THE COURT:  Thank you, ma'am.

MR. THORNELOE:  Your Honor, next we have Ms. Donna Forga and she is also in a victim in this case and would like to address the Court.

THE COURT:  Please state your name and then you may proceed.

MS. DONNA FORGAY:  Good afternoon, your Honor.  My name is Donna Forga and I am a District Court Judge in the 30th Judicial District, which is composed of Haywood, Jackson, Macon, Swain, Clay, Graham and Cherokee Counties.  I'm here with Judge Wijewickrama who is also serving with me.

Judge Wijewickrama and I make difficult decisions every day, but the reason we're here today is because we've done things that everybody in this room did today.  We brushed our teeth, we took a shower, we flushed a toilet, we filled a water bottle, we discharged water.  And because of that, we were accused of attempting murder by toxic pollution.  That's hard for me to take.

As to the defendant, Mr. Dever, I don't know anything about him.  In fact, I haven't seen him before he walked into the

courtroom today, but Ms. Moody is a different matter.

And I may, if you'll forgive me, refer to her from time to time by Ms. Gibson because we have a long history. Ms. Gibson went to high school with my younger sister. I was in high school with her husband. I was in my high school chorus with her husband. And, in fact, up until just recently, she played the piano at a little bitty Baptist church in Maggie Valley where my family has attended for more than 40 years.

I have never known Ms. Gibson to be anything other than kind, engaging and a genuinely beautiful person and that is why this is so hard, your Honor. I would never and still would not think that Ms. Gibson would ever try to act to collect the bounty that was placed on me or to proceed with a warrantless arrest; but my question is who else is emboldened by those actions to act that way?

I have taken children away from families where they were abused, I've entered those domestic violence protective orders, I've set bonds in cases for murderers. And who would take those documents as they've been presented and use them as a reason to take advantage of already difficult feelings against me?

When I was first served with -- served with that writ of execution, the first thing that I noticed was that it had my home address on it. There are lots of reports that district court judges have to file that even our state government understands that it's not appropriate for our home address to be there because of the danger to us because of the job that we do.

1          The second thing I noticed was that there was a lab

2    report attached that was a sample of water.  And, of course, the

3    first thing that crossed my mind then was had someone been to my

4    home and collected that water sample that I didn't know about?

5          Last August I went to my 41st class reunion and because

6    ours was delayed by COVID, the class that it was also their 40th

7    were there as well.  So there were a lot of people there that I

8    didn't know.  A couple hundred people to be exact.

9          There was one particular gentleman who came up that I

10   didn't recognize that sat at a table with me and the topic of these

11   documents came up.  As we were talking with others at the table, it

12   became apparent to me that some of the people had all the

13   information about these documents from the news.  This one

14   gentleman, however, knew way too much about what was in there.  Way

15   too much about what was there that had nothing to do with the news

16   story.

17         So when he made a comment to me about taking control of

18   my person or my property to collect that reward and laughed about

19   it, I left and I went home.  And after that I became very reluctant

20   to go to my grandchildren's events.  I have 12 grandkids from 9 to

21   23.  I was reluctant to attend their sports events.  I had to think

22   hard about going to their high school graduations because I simply

23   didn't know who else might be seeking that $20,000 reward.  My job

24   provides protection for me but not for my family.

25         Making this even more difficult with my home address out

there for everyone to see was that in 2018 my husband was diagnosed with stage 4 esophogeal cancer. He stays at home by himself, many times heavily, heavily medicated.

And one of those particular days as I was driving to do my job in Cherokee County, as I came up to Nantahala where I knew there was no cell signal, the last thing he said to me before I hit that block in the cell signal was, hold on, honey, there's somebody at the door, just as I lost that signal.

From there I had to drive through Nantahala Gorge over Topton, past Granny Squirrel before I came to the four-lane where I knew I would have signal again. And by the time I was able to get him on the phone, my stomach was in knots. I was sick. And I will tell you, your Honor, I am very rarely, if ever, afraid, but until I got to hear his voice that time, I was a complete basket case. I was sweating profusely and physically sick because the first thing that crossed my mind is: Has somebody been to my house to take advantage of my husband?

I can accept all the risks to me, your Honor. I took those risks when I took my oath 13 years ago to be a judge. I take that responsibility every day that I make these difficult decisions, but there's no reason that my family should live under this sort of threat.

So what these defendants have taken from me is my peace, the peace that I can go about and do my job, and at least have the risk against me be those that you would expect from day-to-day. And

with all due respect, your Honor, having worn that black robe, I respectfully say that there is nothing that you can do to give that back to me.

Thank you.

THE COURT: Okay. Thank you.

MR. THORNELOE: Your Honor, next the Government would call Mr. Anthony Sutton. He is a victim in the case and he would like to give a victim impact statement.

MR. ANTHONY SUTTON: Thank you. My name is Anthony Sutton. I'm a council member for the Town of Waynesville.

The perpetrators' calculated and malicious intentions to cause me harm has forever shattered my sense of security and peace of mind.

Beyond the direct impact to me, my loved ones have also suffered tremendously. The thought of what could have happened to me haunts them and they, too, now live in constant worry and fear for my safety. Witnessing their pain and helplessness is an additional burden I carry. Knowing that my trauma has deeply affected those closest to me.

While I'm thankful that law enforcement intervened in time to prevent the full realization of this horrific crime, I remain forever changed by the event that transpired. The sense of security and freedom that I once took for granted has been shattered, replaced by a haunting feeling of vulnerability and helplessness.

1          I humbly request that the Court consider the gravity of

2    this crime and the profound impact it has had on my life and the

3    lives of my loved ones when determining the appropriate sentencing

4    for the perpetrator.  I hope that justice will be served not only to

5    hold the offender accountable but also to prevent others from

6    experiencing the terror and trauma that I have endured.

7          Thank you for allowing me the opportunity to share my

8    victim impact statement.  I trust that the Court will carefully

9    consider the lasting consequences of this crime in delivering a just

10   and appropriate sentence.

11         Thank you.

12         THE COURT:  Thank you.

13         MR. THORNELOE:  And, your Honor, finally we have Mr. Roy

14   Wijewickrama and he would like to give a victim impact.  He is also

15   a victim in this case.

16         MR. ROY WIJEWICKRAMA:  Good afternoon, your Honor.  My

17   name is Roy Wijewickrama.  I serve with Judge Forga on the District

18   Court bench in the 30th Judicial District and I also serve as the

19   Chief District Court Judge for our seven western counties.

20         As Judge Forga indicated earlier, when we signed up for

21   this job and we decided to run, we practiced for many years.  We

22   understood that there were certain risks.  We make decisions every

23   day where we have to remove children from homes, sentence criminal

24   defendants.  I understand why some of those individuals may become

25   upset with us.  Doesn't make it right, but I get that.  I understand

1  it, but what we're dealing with here today, I just don't understand.

2  I've tried to wrap my head around it. I don't understand what kind

3  of fantasyland some people are living in.

4         I recall the day that I -- I hate to even use the term

5  being served with this, when I received this paperwork, this writ

6  that essentially called for me to be -- and two of my colleagues to

7  be kidnapped. I was speechless. It was initially brought to my

8  attention from our sheriff at the time, Sheriff Gregg Christopher.

9  It was actually sent to our Superior Court judges via fax.

10         So after letting it sink in one afternoon last summer, I

11  immediately called my wife, Jody Wijewickrama, who is here in the

12  court with me today, and I asked her if the kids were outside -- I

13  have three children. And I asked her -- and in fact they were, two

14  of them were outside playing basketball -- and I said, get them

15  inside immediately.

16         And from that day forward, because these individuals had

17  plastered our address on this web site, which also was part of this

18  so called writ, our home address was and is available to thousands

19  of these individuals and that is very troubling. And I understand

20  we're public officials, I get that, but this -- in this context for

21  our home address, for my bar ID number to be out there, to be doxed,

22  if you will, in the fashion that I was, my colleagues were, it's

23  beyond troubling and it has had a profound impact on myself, my

24  wife, my kids. We've had a hard time even trying to explain to them

25  -- our oldest child understands a little more, but it has been --

1    it's changed the way we live.

2           Like I said, I understand there's some risks that are

3    associated with this job, but I never once imagined that myself, my

4    colleagues, their families and my family would be placed in such a

5    predicament.

6           I don't know either of the defendants.  I know of Ms.

7    Moody.  From what I understand, she had a wonderful reputation in

8    our community.  Her family has a wonderful reputation.  And I can

9    say it is shocking to many in the community that we're even here.

10          But I just want the Court to know that it has had a huge

11   impact on our family and every day now I have to -- we always have

12   to be concerned about our children, but even more so now with this

13   current environment we're living in, and then these defendants

14   essentially pouring fuel on the fire, if you will, it's very -- it's

15   very troubling.

16          But despite all that, I still have faith in the rule of

17   law and I hope they understand that and we'll certainly respect Your

18   Honor's decision.

19          And I appreciate you giving me the opportunity to speak

20   today.

21          THE COURT:  Thank you.

22          MR. THORNELOE:  Your Honor, those are all the victims

23   that will be making impact statements here in person.  Of course,

24   the Court already has several written victim impact statements and

25   we know the Court will consider those as well.

```
 1            THE COURT:  And just to make sure that I have a clear
 2   understanding, there were several that were attached to the
 3   pre-sentence report, but only one that was filed thereafter; is that
 4   correct?
 5            MR. THORNELOE:  Yes, your Honor.  I believe one came in
 6   this week as a supplement to the PSR and that's the one I think
 7   you're referring to.
 8            THE COURT:  Is there anything else that we need to
 9   address before we move on to the arguments of the appropriate
10   sentence to impose with regard to each of these cases?
11            MR. GAST:  Not from the Government, your Honor.
12            MS. JONES:  Not from Mrs. Moody, your Honor.
13            MR. ANDERSON:  No, your Honor.
14            THE COURT:  Okay.  Ms. Jones, let me turn to you.  What
15   is the appropriate sentence that I should impose here with regard to
16   Ms. Moody?
17            I've read your brief.  As you've heard me say many times,
18   you don't need to repeat what you've already had me read, but I want
19   to give you the opportunity to advocate further for your client in
20   supplement to what you have submitted in writing.
21            MS. JONES:  Thank you, your Honor.
22            I will try not to repeat my brief, but with regard to our
23   general request, we are asking for a downward variance or variances
24   to a total offense level of 13, which with Ms. Moody's Criminal
25   History Category I, would be in Zone C, 12 to 18 months.  And within
```

that range we're asking this Court for a sentence of time served and supervised release with a term of home detention.

The Court knows, but with a sentence falling in Zone C like that, the Court can impose a sentence of imprisonment with supervised release with a condition that substitutes home detention. There has to be at least one half of the minimum term satisfied by a term of imprisonment. As Ms. Moody has been in custody over 10 months, that would be satisfied. But we are asking for that home detention to, I think, bridge the gap to get to that 12 months.

Your Honor, as a preliminary matter, I understand that Ms. Moody got involved in this offense at a very vulnerable time in her life and I tried to express that to the Court in the sentencing memo. She was separated from her church community, she was no longer working, she was experiencing family turmoil.

And I don't know that she recognized it at the time, but it seems to me that she was searching for a community. It's not an excuse, but I think it's an explanation for how this person, who I think even people here today have said, has a reputation as a beautiful person, a lovely person. But that's how I think she got plugged into the PBI or Peoples Bureau of Investigation.

Ms. Moody really had not been involved in social media except for LinkedIn, I understand, so she was really naive to these things. And so, you know, there was a point in her case where I was looking at her situation as, is this a person who had abhorrent conduct, something out of the ordinary for her, and I don't think

1   she qualifies.  There were 57 folks, all these different writs.

2   However, I do think it's mitigating to some degree that nearly all

3   of her character letters, nearly all the people who are friends and

4   family who wrote to the Court said, this is out of character.  I

5   think that's been said today.  I do think one of the filed --

6   recently-filed victim impact statements say the same thing.

7           She's a 57-year-old grandmother.  She's been married for

8   34 years.  Never spent more than three days without seeing her

9   husband.  She had a strong work history, which we don't see in this

10  court very often, working as an appraiser and in various family

11  positions.

12          And I also wanted to make a legal point, while this isn't

13  an objection -- we are dropping obviously our objection to the

14  obstruction of justice increase and it does typically apply because

15  I think the application notes say if someone doesn't -- willfully

16  doesn't come to a court hearing, they should get the increase.  So I

17  thought we needed to embrace that, but I think there was really *de*

18  *minimis* obstruction in this case.

19          And so far as that, she didn't come to the arraignment.

20  Five hours later that same day, she was arrested.  So in my mind,

21  she just kind of barely qualifies for that.

22          And as I explained in the sentencing memo, I wanted it to

23  be clear that I do think at that time Ms. Moody was in the thrall of

24  this organization, it's not an excuse, but I think that's why that

25  happened.

1        And I wanted to at least try to explain to the Court how

2   much Ms. Moody really transformed since this case began.  I think

3   who she was at the arraignment is not the person that she is today,

4   but isn't even the person that she was when she was representing

5   herself and decided to plead guilty and resolved her case with the

6   Government.  I mean, I think that that shows the change in her

7   thinking, her acceptance of responsibility and her wanting to get on

8   to the right track.

9        There were numerous motions filed in her case as the case

10  began, which I'm sure the Court is aware of.  All of those went away

11  with her plea.  She pled guilty.  And that was before any of the

12  other defendants had made it to this district.  So I do think that

13  that's important and I wanted to highlight that.

14       With regard to the bases for our downward variance

15  request, I'll just highlight some of those.  I think that it's

16  evident Ms. Moody has been involved in charitable service and good

17  works.  And I tried to include character letters that showed that

18  from ministers, other church members.

19       And Ms. Moody's service to the community involved playing

20  the piano, playing the organ for her church and even for other

21  churches.  She played for revivals, she played for funerals.  I

22  think that's really notable.

23       I did bring to court, just at least to kind of hold up,

24  her family did make numerous CDs when she was involved in making

25  Christian music throughout her life.  I have six CDs here that she

had made with numerous groups and even a record, I think before the

time of CDs, but I thought it was important to show the Court that

unlike many defendants coming before this Court, Ms. Moody is not

someone who found religion at the jail.  She is someone who has been

very committed to her religion throughout her life.

And even at the jail, I wanted to highlight for the Court

that Ms. Moody has essentially been like a trustee.  She's been a

real model inmate.  I can see it when guards bring her out to meet

with me, the way that they address her, the way that they deal with

her.  She's a different type of person than many coming before the

court.  But she was volunteering to clean bathrooms, clean up trays.

Do all these things in this foreign environment that she's never

been in before.

Ms. Moody's mental and emotional condition I think is

another basis for downward variance that we're asking the Court to

consider.  We are not -- I would note that as our expert explained

in the report to the Court, Ms. Moody's been diagnosed with anxiety

and depression and there's some unknowns.  I think that our expert

said, there are some things going on with Ms. Moody that can't

adequately be explained by the symptoms that she's exhibiting that

don't fit into anxiety and depression.  There are some other things

going on, but I think that those things going on contributed to her

being particularly vulnerable to committing the offense here.

She was naive, as I said, and she really wanted to do

good things for her community.  And I think some of her church work,

some of her other community involvement was not available during the
pandemic.  So when she learned about what she believed to be this
effort to fight child trafficking, to prevent water pollution, she
bought into that -- and I get -- I understand the Government's
argument that the writs don't really talk about water pollution,
they're not talking about child trafficking.  So it may seem
insincere to make this argument, but I'll note -- and I do think it
at least somewhat comes through in the record here in the filings to
the Court -- the Peoples Bureau of Investigation online did talk
about the water pollution and did talk about child trafficking and
some of these other issues.  And I think Ms. Moody bought into it
kind of as a whole thing, as strange as it may seem.

          And I've worked in various ways to wrap my mind around,
how does this writ going to this person change water pollution?
This person has nothing to do with the water?  There was this ethos,
this belief system, this organization online that was purporting to
deal with these things.

          And I think that we all can agree that child trafficking
is wrong, we all can agree that we want quality water.  And I think
Ms. Moody's efforts at trying to do the right thing got channeled
into this.

          And I did want to point out, and I think it's fairly
apparent, a lot of -- in terms of Ms. Moody's beliefs and what she
was thinking at this time, it's a little difficult to attribute
every part of the writs to her insofar as -- not that she's not

1   pleading guilty, not that she didn't file them, but she didn't

2   produce these.

3         There were a lot of materials produced by the PBI, how to

4   serve writs, you know, pages of instructions, instructional videos,

5   a website, merchandise, et cetera, that Ms. Moody played no role in.

6   And so, you know, I think that may be where some of this gap is

7   that, you know, if Moody -- Ms. Moody had drafted a writ and it

8   didn't say anything about child trafficking or water, okay, I can

9   see that.  But I think here were these things -- she took these

10  tools to try to address these problems and had this genuine but

11  obviously very naive idea that folks could sign these writs in this

12  sort of re-oath procedure that I don't fully understand, but that

13  that would resolve it.  That would be the end of things, which

14  obviously certainly today we know that that's not correct and that

15  wasn't correct before.

16        I also wanted to highlight Ms. Moody's remorse as a basis

17  for a downward variance and I'll be brief on that point.  I think

18  the motion for departure today I think indicated reasons that the

19  Court can consider regarding her remorse.  We're joining in that

20  motion, even today we're sitting at the same table with a

21  co-defendant.

22        And as I noted, I've never seen a situation where a

23  defendant represented herself and worked out her case, resolved it

24  with a plea, embraced her responsibility, accepted her

25  responsibility, as Ms. Moody has.

1          In fact, I thought maybe there were some legal arguments

2     to be made in her case and, you know, at that point she just jumped

3     in and said, I want to do the right thing.  I want to accept

4     responsibility, I've done wrong.  And I think that that's

5     significant.

6          The Court also will be hearing from Ms. Moody in an

7     allocution.  I think the Court will hear from Ms. Moody about her

8     remorse.  I even could see today, watching what's been happening in

9     the courtroom, she's just been anguished and feels terrible for all

10    the harm that she's caused.

11         Your Honor, overall, we're requesting the sentence

12    reduction based on those arguments, but obviously the Court can get

13    there any way the Court sees fit, but I thought it was very

14    important to note that Ms. Moody is -- she's just so much more than

15    this offense.

16         She spent a lifetime -- I think one of the character

17    letters said 50 plus years -- being a good citizen.  So while this

18    offense obviously has caused tremendous harm and she recognizes

19    that, that's not who she is and she's tried to move forward from

20    that and she hopes that her time in jail has made up for that.

21         Especially from the tradition that Ms. Moody has come

22    from, being deeply involved in the church -- love your neighbor as

23    yourself -- this in court -- who Ms. Moody appears to be in court

24    today in this jumpsuit at the jail is not who she is.  It's not the

25    way she's intended to treat her neighbor ever within her life.  She

wants to get back out of custody and make up for the harm that she caused.

I can tell the Court that she's had some very unusually difficult conditions in the jail, which everyone has. And I acknowledged that in the sentencing memo, everyone misses Mother's Day, everyone misses Christmas. But at one point she was housed with someone charged with a really horrific murder. She was a cellmate of someone charged with this murder who was extremely mentally ill. I was looking up the case online and I was horrified. And I know you commit a crime, that you put yourself in that situation, but I think for someone like Ms. Moody who's never been in trouble before except for a speeding ticket, this has been a very, very serious punishment.

She was bullied by people at the jail who look at her and know that this is not the place that she normally is. And at one point at the jail when I was comforting her, I just -- I would have to say I just felt so much that this is my calling because she has suffered, I would say more so than most of my clients, was so in need of comfort. And I just wanted to highlight that for the Court that Ms. Moody is a different type of person.

So this Court can impose a requested variance, time served, on the bases I've cited or others. She obviously has strong community ties, she has had pre-sentence rehabilitation. And so we're asking for time served with the condition that at least two months of her sentence or her supervised release be served on home

1    detention.

2            I have absolutely no doubt that Ms. Moody has been a

3    hundred percent deterred from this conduct.  The Court will never

4    have to worry about her again.

5            In terms of general deterrence -- and I recognize that

6    can be a concern here -- but I think with regard to Ms. Moody, I do

7    think that there could be some general deterrence even with this

8    sentence because it sends a message, you will have to do some jail

9    time.  You do anything like this, you will have to do some jail

10   time.  There are opportunities for deterrence involving the

11   co-defendant in this case as well.

12           And I also wanted to note for the Court that Ms. Moody

13   has absolutely no objection to the request in the recent victim

14   impact statement of no contact with victims' families.  She has zero

15   objection to that.  And is sincerely sorry for all the harm that

16   she's caused.

17           THE COURT:  Okay.  Thank you.

18           Mr. Gast, what's the position of the Government?  And as

19   with what I told Ms. Jones, obviously you've submitted a sentencing

20   memorandum, but I'll give you the opportunity to speak in supplement

21   to what you've already filed in writing.

22           MR. GAST:  Thank you, your Honor.  And I, too, will

23   endeavor not to retread that ground too much.

24           Your Honor, the Government's recommendation is a

25   Guideline sentence, which the current range, as the Court indicated

1    by reference to the Government's motion, is 24 to 30 months.  We

2    recommend that range because that is a mitigated range.

3              Most of the things -- well, really all of the things that

4    Ms. Jones indicated as mitigators in this case were factors that the

5    Government considered when making this particular offer to the

6    defendant.  So in essence, we've priced it at that point precisely

7    because of all those things.

8              I'll start just -- and, of course, I went into detail in

9    the sentencing memo so I won't repeat that here -- but this crime

10   was very serious and I can't say it any more adeptly than the

11   victims did when they allocuted to the Court.  And they are just

12   four of the 57 or so that this victim -- this defendant, rather, was

13   directly responsible for.  And then there's another 850 or so out in

14   the country that have been victimized by the same organization.

15             It is -- these involve public bounties, they were

16   threatened actually twice.  Once by the receipt of the writ and then

17   again when doxed.  And really, in Ms. Moody's case, a third time

18   when she posted notices in the post office.  That's just a lot of

19   harm to a lot of people in this community and others across the

20   country.

21             The nature of the group that targeted them being an

22   anonymous organization makes this a much worse threat than the

23   typical threat that we would normally see under an 875(c) charge.

24   And the fact that they were public servants, too, is -- just makes

25   this all the more atrocious.

1          And, you know, for all the patriotic rhetoric behind the

2     writs, it was just so un-American.  This notion that you've been

3     convicted by a court you've never met, that you've never heard of

4     and now all you can do is plead for mercy before us.  I mean, you

5     know, anyone who would endorse that philosophy in the name of

6     patriotism needs to get their heads right.

7          It's a very serious crime and ordinarily this would be

8     one that we would be seeking an upward departure or variance in if

9     for -- just the number of victims alone that we would normally be

10    asking for upward variance or departure in this case, as we did with

11    Mr. Dever, who sits in a very different posture than Ms. Moody.  So

12    the fact that we have not is a mitigated sentence in this case.

13    That we considered all that when making the plea offer that we did.

14         I want to point out, too, that Ms. Moody -- one

15    significant difference between Ms. Moody and Mr. Dever is that Ms.

16    Moody was the one who actually selected the targets.  I mean, in

17    this case, you know, Mr. Dever was the one that encouraged people,

18    go after the sheriffs first because once you get the sheriff, we can

19    get their badges and their guns and their keys to the jail and that

20    will help us to facilitate phase II of the plan, which is to arrest

21    everyone else in government.

22         But it was Ms. Moody who chose our local victims or the

23    57 in her indictment.  Almost none of them had anything to do with

24    water quality, by the way.  Some of them in particular were

25    healthcare workers who angered her because she was required to wear

a mask during -- at the hospital during the pandemic.  That's why
they were targeted.

The Court heard the voicemails that she left for the
Haywood County Registry of Deeds, whom she knew personally --
friends, much like Judge Forga -- and those messages were not about
water in particular.  Instead they were talking about her lofty
position over them and over the rest of government and about how the
Government should be removed.  One quote was:  The Government is our
enemy and you're in it and if you're in the Government, you're
guilty of all their crimes against humanity.  You know, this is the
-- what motivated these things and she was the one that picked the
victims.

And what's even worse is she's -- some of the people she
selected were people whom she knew personally and that didn't stop
her from making victims out of them.

Ms. Jones referred to the re-oath thing -- you know, that
perhaps Ms. Moody naively thought if they just do the re-oath, that
they won't actually be harmed.  There's a passage, it's on my pros
memo on page 13 that's a quote from one of those voicemails to the
Register of Deeds.  I'll read the relevant portion of it, but in
that voicemail she left, she said:  If you continue to serve in
government when the people have fired you or arrested you or served
you papers, you're committing more felonies by the day.

Now, she intended it as a warning to her friend, but what
she was also saying is that she understood that arrests would follow

if people didn't do what was demanded of them in this ridiculous
piece of paper. So it is not accurate to say that she did not know
that arrests might follow of these people.

It is also not accurate to say that the PBI solely drew
her astray or that she was particularly vulnerable to the PBI. I
hate to give Mr. Dever too much credit right before we sentence him
as well, but I think Mr. Dever's philosophy found fertile soil in
Ms. Moody and there's a lot of evidence of that. Ms. Moody -- you
know, some of the support letters that were written for Ms. Moody
used words like brain washed or mislead or coerced by some bad
actors.

But what's clear from the record and her history is that,
you know, the entirety of 2022, she was going to lots of websites,
it wasn't just the PBI websites. She was on Telegram to lots of
different places doing a lot of different things. She mentioned in
the pros memo that she went to that Gettysburg conference. That had
nothing to do with the PBI, that was something separate. It was
all, you know, sovereign citizen-type ideology and certainly could
be painted with that broad-brush. But it was not like, you know,
the PBI got ahold of her and then transformed this otherwise, you
know, rational American citizen into a PBI follower.

She and her husband both had a local reputation of being
vocal about QAnon conspiracy and beliefs. They had posted things on
the doors to their home that warned law enforcement about not having
jurisdiction over their home.

1          In June and July of 2022, she and her husband both filed
2     a lot of different things with the clerks of -- the clerks of court
3     and with the boards of election declaring themselves American
4     Nationalists to get off the government books essentially.  They
5     sought to remove themselves from the voter roles because they were
6     alleging constructive fraud, denying that they were citizens and
7     accusing the Board of Election of treason and terrorism.

8          She filed, in July, papers to annul her marriage and
9     reject the state's authority over the marriage.  She wasn't trying
10    to divorce Mr. Moody.  They're still very happily married as far as
11    I know, but it was -- they were trying to get out from under the
12    state rubric and that's why they were filing these papers to annul
13    their marriage.

14         The -- in July she wrote a letter to the military asking
15    them to intervene domestically to remove government officials.

16         I say all this to say that this is not PBI stuff, this is
17    just separate stuff.  So she was self-radicalizing, she was looking
18    for these things.

19         It's unfortunate, I mean -- and I'm not suggesting she
20    was the progenitor of these ideas, but it wasn't -- she was not
21    simply a passive victim of Mr. Dever.  She was already pursuing
22    similar philosophies before finding PBI's website.

23         So this brainwashing, to the extent that it occurred, it
24    came from multiple different sources, but she was also passing the
25    ideas along, too.  She was not a passive recipient of this.  Again,

1   I've talked about the filings.  She was assisting at least one other
2   person known to the Government with serving the writs.

3           So, you know, I've thought a lot about this is that, you
4   know, do we only punish the progenitor of an idea and I don't think
5   that's appropriate.  I mean, at some point you have to hold adult
6   people of sound mind responsible for the ideas that they endorse and
7   embrace and then propagate.  And in this case, the defendant
8   full-throatedly embraced this and other similar conspiracy theories
9   and spread them.

10          I have no doubt that she has a strong Christian faith and
11  had a strong moral compass, but that also means that she should have
12  known better than to threaten her neighbors and to threaten her
13  friends and to threaten strangers across this -- across this
14  district, across this state and some out of the state.

15          It really doesn't make sense to limit punishment to only
16  people who came up with a bad idea and then convinced others to do
17  it.  I mean, if we have three people that rob a bank at gunpoint, we
18  don't even bother to ask whose idea was it.  At a certain point, it
19  doesn't matter whose idea it was.  If all three of you agree to do
20  it, it really doesn't matter if one persuaded the others so much,
21  except for perhaps that person might get a leadership enhancement,
22  which the Guidelines already take into account in this case.

23          And conspiracy theorists exist in sufficient numbers that
24  we cannot afford to withhold punishment simply because they were
25  exposed to bad ideas.

1        I mean, this Court every day sees a parade of people that
2   engaged in bad ideas.  Dealing drugs or using drugs is a bad idea.
3   Robbing banks is a bad idea.  Committing fraud is a bad idea.  So is
4   threatening people with arrest and the forfeiture of all their
5   assets and putting cash bounties on their heads.

6        With respect to her psychological report.  I've reviewed
7   it, I know the Court has.  I would suggest to the Court her
8   psychological report, frankly, is rather unremarkable.  I think that
9   very few people live lives free from adversity and trauma and Ms.
10  Moody is no exception.  But as compared to reports that this Court
11  normally sees at sentencing hearings, I mean, hers is a pretty
12  ordinary person's psychological report.  And as such, I would submit
13  that it doesn't have mitigating value in this case.

14       But what I would say, your Honor, is -- again, to bring
15  back to where I started, which is the Government has already
16  accounted for almost -- all the mitigators that have been presented
17  to the Court and she has gotten a significant amount of benefit
18  already from the plea agreement.  I mean, just by pleading guilty to
19  one count, she was spared the grouping unit enhancements that Mr.
20  Dever received.

21       And the factual basis that supports this crime also
22  supports the crime of conspiracy to commit kidnapping.  There were
23  many, many, many overt acts in furtherance of the conspiracy to
24  commit kidnapping.  And her Guideline range, if she had just pled
25  guilty straight up and was convicted of kidnapping, would be 210 to

1   262 months.  So we're asking for a tenth of that, partially because
2   we have considered those aggravating -- those mitigating factors.
3        She definitely is remorseful, I would certainly concede
4   that, and she was cooperative with the Government.  And we have
5   rewarded that.  But we have been very reasonable with her and she's
6   received substantial benefits from her plea.  But we've already
7   discounted for those mitigating factors and we'd ask the Court not
8   to discount further.
9        With respect to the -- very briefly, with respect to
10  defense argument that the obstruction of justice was *de minimis*.  I
11  would simply ask the Court when considering that argument, to look
12  at that from the perspective of law enforcement.
13       The law enforcement officers in this case, any time
14  they're dealing with a sovereign citizen case, they take great care
15  for their safety.  There have been numerous counts -- accounts of
16  law enforcement officers getting into shoot-outs with sovereign
17  citizens due to their beliefs that they have no jurisdiction over
18  them and some that -- literally having religious zeal about their
19  beliefs.
20       And so when Ms. -- yes, it's true that the effect on the
21  Court was minimal.  Ms. Moody missed her arraignment and then she
22  was arrested and then she had her arraignment fairly quickly
23  thereafter.  But as I detailed in the response to the objection, the
24  Government had to respond with many, many agents to make sure that
25  that was a safe re-arrest.  And remember, this is to the same house

that had all those things posted around the house about how the
Government doesn't have authority over them and that they will be
sued if they try to exercise jurisdiction over their home, and
things of that nature.  So I'd ask the Court to consider that when
considering whether it was indeed *de minimis*.

Finally, your Honor, I just want to address -- I've
addressed the 3553(a) factors in my memo, I don't want to repeat
that.  But I do want to emphasize one point and that is that this
case perhaps -- perhaps more than any that I can recall -- has a
uniquely high need for general deterrence.

I think when we sentence, we typically focus on the
specific deterrence.  Is this defen -- are we going to make an
impression on this defendant such that this defendant won't be back
in this room again and I think the answer to that question is
probably no.

Again, it's hard to know if people with deep-seated,
sovereign citizen-type ideologies, what they're thinking about the
court and what they're going to do next, but I would certainly
concede I don't have evidence to the contrary that she won't be back
again.

But the need for general deterrence is why.  The need for
general deterrence in most cases is simply we need to show people,
don't commit crimes because there's consequences, right.  Sort of in
the general sense of general deterrence.

Here we have a very specific sense of general deterrence

1  in that 900 people have been served by this organization in 32

2  states so there's a lot of Ms. Moodys out there.  So the Court's

3  judgment needs to tell those people, knock it off, no more, and

4  certainly don't execute any of these writs and kidnap people because

5  there will be severe consequences.  And I fear that a time served

6  sentence won't do that.

7          So, your Honor, I ask the Court to consider where she

8  could have been, where her conduct has earned her.  This is a

9  very -- the Guideline range is a very light sentence for her

10  already.  And we've given her the ability -- the Government has

11  given her the ability to have a very light -- low sentencing

12  Guideline range because of the way we structured the plea agreement.

13          And so I'd ask the Court to consider, in particular, the

14  need for general deterrence and give her a sentence that's within

15  the Guideline range.

16          Thank you.

17          THE COURT:  Okay.  Thank you.

18          Ms. Moody, at this time you have the opportunity to

19  address the Court and to tell me anything that you feel I should

20  know before I make my decision regarding your sentence.

21          DEFENDANT MOODY:  Dear Judge Reidinger, I sincerely

22  apologize to this Court, the victims and my family for the pain and

23  heartache I've caused.  I ask for forgiveness from each of you.  I

24  also have asked God for forgiveness.

25          My actions were so against my usual nature and character

as I have always strived to bring comfort to others, primarily
through music.  I have a sincere love for my fellow men and women as
God instructs us to love our neighbors as you would yourself.  I
promise this will never happen again and you won't see me involved
in anything like this in the future.

This has been a very hard, actually, the hardest lesson,
I've ever had to learn.  I still am shocked that I ever listened to
such deception and misinformation.  The jail experience has been
traumatizing for me and being away from my dear family has been like
a dagger through my heart.  I've missed my dear husband, mother,
daughter, granddaughter so much and I know they miss me as well.

I have goals to get back to my music, caring for my
family and working, as I see a new beginning that I'm eager to get
started.

I'll never take anything for granted as I now can see I
have been very blessed.  I have found more about who I am over the
past 10 months than I ever have known before.

I beg for another opportunity.  To put my time and
talents into the community in a good way.  Please have mercy and
allow me the chance to prove myself.

Thank you so much.

THE COURT:  Okay.  Thank you, Ms. Moody.

Mr. Anderson, you were mentioning earlier that at this
stage of the proceedings, that you may wish to have a discussion
with your client.

1          MR. ANDERSON:  Yes, your Honor, that would be helpful.

2          THE COURT:  Is this something that you would want to have

3    a discussion back in the holding area?

4          MR. ANDERSON:  Yes, Judge.  That would be fine.

5          THE COURT:  Well, what we're going to do -- because we've

6    been at this now for two hours.  So what we're going to do, we're

7    going to go ahead and take a 15-minute break and I guess both

8    defendants will be taken back to the lock-up, but that'll give you

9    the opportunity to go back there and talk to your client and we will

10   resume in approximately 15 minutes.  Will that be an adequate period

11   of time for you?

12         MR. ANDERSON:  Yes, your Honor, I believe it will.  Thank

13   you for your courtesy.

14         THE COURT:  Marshal, 15 minutes, please.

15              (Recess commencing at 3:59 p.m.)

16   (The defendant, Darris Gibson Moody, escorted out of the courtroom

17        at 3:59 p.m. and returned to the courtroom at 4:12 p.m.)

18   (The defendant, Timothy Michael Dever, escorted out of the courtroom

19       at 3:59 p.m. and returned to the courtroom at 4:12 p.m.)

20              (Recess concluding at 4:15 p.m.)

21                (Open Court at 4:15 p.m.)

22         THE COURT:  Mr. Anderson, I'll give you the opportunity

23   at this time to address the question of the appropriate sentence for

24   Mr. Dever.

25         MR. ANDERSON:  Thank you, your Honor.

1          THE COURT:  I've read your memorandum, but I'll give you

2     the opportunity in supplement to that.

3          MR. ANDERSON:  Thank you, your Honor.

4          As I indicated in the memorandum, I would request a

5     variance in this case.  As I mentioned earlier, the Guidelines -- I

6     think we all agree that this Guideline doesn't fit this case sort of

7     -- it's not the typical case the Sentencing Commission had in mind.

8     And certainly as we start stacking enhancements, one on top of

9     another, we get to what, to my mind, is an excessively high sentence

10    under 3553(a).

11         We do recognize that our sentence here is going to be

12    tied to Ms. Moody's sentence and so I don't know exactly what your

13    Honor is going to impose there, but we would ask for a sentence, you

14    know, at her level or around her level -- perhaps slightly above --

15    because we do recognize that there are some aggravating factors over

16    here, but also some mitigating factors that are not present over

17    there.

18         I do want to say to all the victims here that this is a

19    sad day for everybody.  You know, I certainly fully agree that no

20    one in this country deserves to be frightened or afraid and I can

21    empathize with that.

22         I mean, three years ago, I was the victim, with my son,

23    of a carjacking at a McDonald's and so I get what it's like to be

24    afraid.

25         And then when the defendant skipped out on bond and have

1    to worry about the rustle in the bushes.  Like, well, is this the
2    guy that held me up at gunpoint?  I get that, right.

3            But I also agree with what Judge Forga said that the
4    tools that we have in the law are exceptionally imperfect and so
5    what we do here today -- and just like when the defendant in my case
6    was sentenced, to five years.  Nothing that was done in that
7    courtroom in any way, shape or form could undo the fear that I felt,
8    could undo the fear that I will fear in the future not only for me,
9    but for my son so I get that.

10           But, again, our tools here are prison, home
11    incarceration, supervised release.  That's kind of all that we got
12    and it's a very imperfect system.

13           So I certainly empathize with the victims.  I mean, have
14    been there myself.  I have written victim impact statements.  And I
15    certainly understand that although any sort of -- I don't want to
16    use the word -- I guess most people reading these writs would view
17    them as completely nonsensical, and I get that, but I also get that
18    there are people who do nonsensical things.  And sometimes something
19    that's written in crayon might be scarier than something that's
20    typed out on sort of legalese and so I get that.

21           So I'm not trying to minimize at all the harm that the
22    victims have suffered, but I don't know, again, that a sentence of
23    what Mr. Gast is going to ask for, 180 months or so, is at all
24    proportional to that harm.

25           Because, again, although a lot of bad things could have

happened, a lot worse things could have happened, I think it is
important to not lose sight of the fact that those other things that
could have happened have not happened.

     And I think that we don't want to -- obviously we have to
account for that risk, but I think there is a marked difference
between the actual accomplishments of those threats and the mere
uttering of the words or the mere giving of the documents to
someone.

     And as I note in the -- in my memo with respect to the
Guidelines, in some sense, an actual completed assault would result
in a higher Guideline than just these mere threats here, which is --
again, it's because of the very unusual way that this fact pattern
fits into the Guidelines.

     But, again, I just want to focus on, yes, it was bad what
happened.  Yes, he said a lot of things he certainly should not have
said -- a lot of things that he, I hope, understands that he should
not say in the future -- that could have led to a much worse result,
but it didn't.  And I don't want to lose sight of that fact today.

     So it's certainly sad for the victims here, I get that.
It's also, of course, sad for Mr. Dever's family.  You have read the
many letters of support that I have submitted and also Dr. Cantley's
report that summarizes some conversations with the family that they
really felt like that they lost Mr. Dever.  When COVID happened, it
was a crazy time for everybody.  And, you know, to fall into a
rabbit hole of sort of social media, where social media companies --

the way that they get you hooked on it is to keep feeding you more and more outrageous content. And, again, Congress has said they can do it. You know, I'm not in Congress so I can't really speak to that. Doesn't seem like a good idea to me. But, you know, being locked down, having your business shut down, it was just a crazy time for everybody.

And I'm sure all of us here in the courtroom sort of remember how it impacted us as -- in our lives. And, again, it just -- it caused Mr. Dever's family to lose the person that they knew before. So I think you saw from his wife's letter in particular that she really wants the Tim that she knew five years ago to come home because that's the -- you know, that was just such a different person. Yes, always a little odd. Yes, sort of prone to conspiracy theories.

But the COVID time and thereafter through this offense has been hard on the family. It's been, of course, very hard on their marriage. It's been hard on them financially.

All that's, again, not to minimize what the victims have gone through. Because, again, he didn't have to suffer the fear that the victims had to suffer through. But it's been hard on the family. It's been hard on him, too.

Again, he's not been through the criminal justice system before. He's a true zero, as we say. And, of course, the Sentencing Commission in a few months -- assuming Congress doesn't get involved -- is going to give us a reduction for true zeros.

1          So he's never been to the jail.  And you saw earlier
2    today that he was very confused about sort of the procedure here.
3    This is his very first sentencing.  Most of the folks that sit over
4    here beside me have gone through the state system, you know, several
5    times, maybe the federal court a couple times so it's not their
6    first rodeo so they understand how this process works.  All of this
7    has been completely foreign to him and so that's been hard.

8          As I note, because of his unorthodox beliefs, it's been
9    hard on him in the jail and some interpersonal conflict there in the
10   jail that has been unfortunate.  But, again, as Ms. Jones noted, you
11   know, in the county jail, you know, you don't get to sort of pick
12   and choose who's there.  And so whether it's murder or for drug
13   possession, you all go in the same box together.  But it's
14   definitely been hard on an interpersonal level at the jail for
15   someone like Mr. Dever who has these unorthodox beliefs that are
16   very, very difficult for him to let go of.

17         It has been obviously an embarrassment to him that he,
18   who has been a devout Christian for many, many years and who does
19   and should understand the Golden Rule, that he didn't abide by that.
20   You know, that's something that he understands that he has to accept
21   responsibility for, both sort of for the judgment of this Court and
22   perhaps from higher powers that also have to pass judgment on all
23   these things so he gets that.

24         And I know that, you know, over the course of the many,
25   many hours that we have spent together -- and when I submit my

1   voucher, you'll see that I have spent many, many hours with Mr.

2   Dever -- we certainly have gone through ups and downs.

3          When I first met him, I was very concerned that -- so

4   much so that I had to get Dr. Cantley to just make sure that I could

5   proceed in the case.  And it's my first time doing that in almost 12

6   years on the panel.  That he was sort of -- these beliefs that

7   seemed so, you know, untethered to reality, that were so hard to let

8   go of.

9          But, again, over the course of many, many months he's

10  come a long, long way.  So we stopped talking about, you know,

11  Agents of the Crown and, you know, sort of all the things that the

12  King of England might or might not have to do with the establishment

13  of the bar in this country.  Things that really had no bearing about

14  anything, but, again, were a testament to how far he had fallen down

15  into this hole -- and that's the best way that I can describe it --

16  and he's, you know, having to claw his way out of that hole and it's

17  been an imperfect climb.

18         Certainly as Mr. Gast noted in his memo, and as I

19  responded, you know, we're not all the way there yet, but I will

20  say, having spent many hours with him, we are a whole lot better now

21  than where we were several months ago.

22         I would say as well the -- talking about Dr. Cantley's

23  report in particular, I take quite a high degree of comfort that she

24  thinks that he will be able to abide by provisions of supervised

25  release and -- including the provision of getting mental health

```
 1    counseling.  That she thinks that he'll be able to do it.  She also
 2    thinks that he is a low risk of violence and I think that's a
 3    positive sign.
 4          So I know that your Honor has to consider sort of the
 5    entire panoply of tools available to you as to how to protect the
 6    public and how to help him get the help that he needs.  And it's
 7    clear that, you know, he needs to figure out a way to be able to
 8    talk with somebody to say, well, yeah, I know I might have heard
 9    that on YouTube, but, you know, what's the real -- what's the real
10    deal and somehow to separate some of that fact from fiction.  That
11    it's very easy to get lost in the -- online because of the way that
12    the social media companies work.
13          I know that we heard from Mr. Gast a while ago about sort
14    of general deterrence as a factor, but, your Honor, for this case
15    and the people who were involved in the PBI, this is not a case of
16    cold calculation of risks and benefits.  I mean, these are people
17    who have, you know, difficulty inhabiting the same world that you
18    and I do and making the decisions that you and I do.  Imposing a
19    harsh sentence, I think, will mean absolutely nothing to people in
20    this community, right and so I just don't know that that's really a
21    big factor here.
22          I mean, obviously there are other people who might want
23    to make more traditional types of threats, like stalking or
24    otherwise that we have to keep in mind about, but to think that
25    people who believe that an environmental district court can
```

summarily convict someone in absentia and that somehow we are going to factor in the judgment of what this very real court does, I don't think that that holds up for -- at least based on the chats that I've seen off of Telegram, I don't know that those folks are going to make that sort of economic type, rational-man calculus in the same way that drug dealers do certainly, right, where you have profits to be made from an -- from an activity.

This was not a money-making scheme. He wasn't trying to extort people for money. He was very misguided, but sincere, I believe, in believing that -- you know, that the water was bad. And we all agree that we should have good water and, you know, I would say that, you know, he could and should have, you know, organized voter drives and other things, the way that our system works to achieve that goal. But I think it is relevant that he was concerned about sort of cancer causing for other citizens.

And so, yes, we have scared some citizens, but he was concerned about harm to other citizens. And, again, it's not a defense under the law. Certainly not. He was not insane so he is -- you know, the law says that he can separate the wheat from the chaff, at least enough to clear the bar for insanity.

But I think it's relevant that he wasn't trying to stalk an ex-girlfriend to terrorize somebody because she left him. He wasn't shaking down people for money.

Again, it was sort of laudable goals perhaps -- definitely wrong means -- but I think that as you consider those

1    3553(a) factors, I think that's certainly relevant.

2            And I don't know that specific deterrence is a lot that

3    really sort of applies here, right.  So if someone has a hard time

4    separating fact from fiction and making cold, rational calculations,

5    you know, this specific deterrence is not a real factor.  I think

6    what is the more relevant factor, beyond specific deterrence, is

7    incapacitation, right.

8            So to the extent that the Court decides, well, you know,

9    until the Bureau of Prisons can give him enough sort of counseling,

10   like, that, to me is, is what's really driving sort of those

11   considerations about deterrence.  It's more incapacitation than

12   deterrence.

13           Judge, you know, I've spent a lot of time with Mr. Dever.

14   He's always -- certainly we have had our disagreements in part.  You

15   know, if I use the wrong word, we get hung up on my word choice for

16   20 or 30 minutes, but even through all that and even through, you

17   know, my sometimes frustration in trying to have conversations with

18   him, he's always been respectful to me and I certainly applaud him

19   for that.  And, again, having that insight and being able to apply

20   that to other people is certainly a positive -- a positive factor

21   for him.

22           I think it's also a positive factor that not only did he

23   plead guilty, right -- required him to take an oath, you know,

24   before his God to tell the truth and to accept responsibility.  That

25   was obviously hard.

1          But I think it's also relevant that he, despite even a
2     slight hiccup this morning, that he has kept with an attorney.  For
3     the first part of this case, he was *pro se* because he couldn't even
4     believe that there were attorneys who were sort of lawfully in
5     place.  But we have gotten past that, we have stayed with an
6     attorney and, again, that's to his benefit I think.
7          I think it's also, you know, relevant that it's not like
8     that the -- you know, that he was sitting around with Ms. Moody
9     calculating sort of who the particular people were going to be.  Was
10    it going to be one, two, three or a hundred?
11         Obviously he's responsible for what Ms. Moody did.  He's
12    also responsible for what other people did who saw his channel.
13    Sort of get that under the law.  But I think it's relevant that he
14    didn't pick out any of these victims to say, I want you to go and
15    target this particular victim because of a particular animus that I
16    have against this person.
17         Again, it was sort of wrong, but it's not the calculated
18    threat like we see in a more typical case involving the Guidelines.
19         I would also note that, you know, he didn't come to this
20    all by himself.  He came to it in part through co-defendant --
21    through a co-defendant, who has gone on to meet his maker and to
22    sort of receive his higher justice.
23         And so if all three of us were sitting here at the table,
24    again, I would say that, you know, whatever the sentence that you
25    would impose upon, you know, the absent co-defendant would be higher

1    to some degree than Mr. Dever's and so he's, you know, somewhat in

2    the middle of the three.

3          Because, again, it's sort of Tom Murphy who comes up with

4    the reclaimator and talks about these writs.  And, again, Mr. Dever

5    is a very gullible individual.  You've seen that from Dr. Cantley's

6    report.  And, yes, he was competent under the law to merit

7    punishment because he did not separate fact from fiction or at least

8    to not be sort of willfully blind perhaps to some of the stuff.  But

9    I think it's relevant that some of this came from someone who is not

10   here for you to order the sentences in that way.

11         I would also note that under his plea agreement he was

12   willing to cooperate and testify against Mr. Murphy.  Now, again,

13   because cancer sort of claimed Mr. Murphy, Mr. Dever didn't have

14   that opportunity but, you know, that's -- it's a testament that

15   under his plea that he has agreed to cooperate here and in any

16   future prosecutions.  And, again, that's a testament to, you know,

17   that this was obviously very difficult to plead guilty.  No one

18   wants to, you know, have to tell your wife, you know, honey, I'm a

19   felon.  No one with children wants to -- you know, to have your

20   children know that you're a felon.

21         So he's done the hard thing so he knows he has to accept

22   responsibility.  He knows this Court is a very real court that's

23   going to impose a very real sentence.  But, your Honor, I would just

24   ask for a significant variance in this case.

25         I mean, again, these Guidelines are just sort of

incredible as we look at sort of what actually happened here.  And
as we look at the one sort of prior threats case that I found from
Connecticut where you saw that the individual had done it on
previous occasions, right.  And then even after that case where I
cited there, I found him because he recently has pleaded guilty to
doing it yet again, right.

And so it was sort of a history of these wild beliefs and
the Government was, you know, willing to countenance a very low
sentence in that case.  So I would say there were probably some
similarities between that case and this case.

And, again, Mr. Dever knows that he has to receive a
judgment, but I think that the Government's position, and even the
Guidelines position, are just far too harsh.

Thank you, Judge.

THE COURT:  All right.  Thank you.

Mr. Gast, what's the position of the Government?

MR. GAST:  Thank you, your Honor.

As we note in our brief, we're asking the Court to impose
a sentence of 180 months.  That is a modest upward variance or
departure above the current applicable Guideline range.

And if I could say, when I say departure or variance, I
want to be clear -- and I think I was clear in the memorandum that I
filed with the Court -- that the Court can do this as a departure
with the tools given to it in the Guidelines manual.  So I may lapse
and say departure or variance, but really the Court can do it either

1    way given the tools in the Guidelines.

2              I'm not going to repeat my argument from before about how

3    serious these threats were.  They were serious for the reasons I set

4    forth in the memorandum and that I argued before.  Uniquely so.

5    Much different than the typical 875(c) case.  And I think in that

6    respect, I think the Court should be inclined to vary upward.

7              But in this case, unlike Ms. Moody, Mr. Dever was the

8    master mind, the recruiter, the creator and the promoter of this

9    scheme.

10              Defense counsel said he just fell down a rabbit hole

11    during COVID.  He dug the rabbit hole.  So that -- you know, saying

12    that he just fell into this is -- just simply does not square with

13    the facts in this case.

14              This defendant was the one that was recruiting people.

15    He was claiming he was going to hire people to be his agents.  He

16    was the one that was instructing people.  He was the one having the

17    live instruction.

18              And the damage lingers.  The PBI website itself is down

19    because it costs money to host it and so while he was in custody, it

20    eventually got taken down, but the videos still remain on YouTube or

21    on other platforms.  The Facebook page for the PBI is still up.  I

22    don't have access to it, it's a private group, but I know that -- it

23    does say how many members and when it was last posted.  There is

24    approximately 1,500 members currently of the FaceBook page for the

25    PBI and there were at least three posts today.  I wasn't able to see

them, but the damage continues even with its leader in custody.

And unlike Ms. Moody, Mr. Dever spoke both publicly and privately about violence and murder against public officials. I endeavored to make that clear in the memo, but there was the references to the tarps. There was the references to him stating, I would like to provide the gun to the trigger man.

There were more -- and I quoted them extensively in the brief, I won't restate them here -- but there were many references to inflicting violence upon public officials unlike Ms. Moody.

Further, this defendant has demonstrated that he is not remorseful for his conduct, which is another big differentiator between himself and his co-defendant. The threats continued while he was incarcerated.

I would note for the Court's attention -- I'm sure the Court read the letters in support of the defendant that were attached to the defendant's pros memo -- sentencing memo, excuse me, and several of them suggested that he now knows what he did was wrong or that he was sorry and perhaps that he was even reformed. And I would say to that, that's just simply not true.

The conduct, even post-arrest and post-plea, threatening to have members of the people involved in the prosecution and conviction in this case sent to FEMA camps where they would be burned to death or killed by electric guillotines.

He -- and the Court's been provided with those -- with those jail calls. And remember, to be clear, we found out about

this from the cooperator first.  The cooperator was so alarmed about
it that the cooperator went to the attorney -- to his attorney and
the attorney alerted us so we interviewed the cooperator.  And it
was only after going back to the jail calls at that point we found
those jail calls that showed that the cooperator was exactly right,
that he was saying those things at the jail.  That certainly is not
indicative of remorse.

He continued to tell his fellow inmates that he was going
to be liberated by the military and white hat marshals and that
everyone that was persecuting him was going to be brought to their
justice.

As recently as last Friday, he was on jail calls
discussing assertions that this Court had no jurisdiction over him
and that he should make that argument.  He may yet argue that when
he gets his chance to address the Court.

So the fact that -- the statement that he's come a long
way, I would suggest there's just simply no evidence of that.

With respect to his psych evaluation, I read that at some
length.  And, again, like Ms. Moody's, his psych evaluation is also
unremarkable.  He is not subject to any mental health diseases.  The
best that the doctor could identify was that he has grandiosity and
extremely overvalued beliefs, which frankly gives me little comfort
that the Court's direct deterrence will have much effect on him.

But there's also evidence in that report that he wasn't
being entirely honest with Dr. Cantley.  For example, he claimed

that he was separating from the PBI for the six months that preceded

his arrest.  We know that's not true because of all the things he

did.  He made new videos, he posted all the things on Telegram in

support of Ms. Moody and in trying, at least imperfectly, to

obstruct justice in her case.

Dr. Cantley's report seems to indicate that Mr. Dever's

primary concern was the water -- and I'm not suggesting that he was

entirely unconcerned about the water -- but when the Court looks at

his website and the things I provided in the memorandum, it is clear

that that was just one of many in a pastel [sic] of concerns that

were anti-government and so his concern was removing government.

Was he concerned about water?  I'm sure he was.  Just

like he was concerned about 5G and GMOs and the vaccine and and and

that were in the writ.

He also -- and Dr. Cantley's report seemed to indicate

that the defendant succumbed to the influence of others, which again

is not borne out by the facts.  He is the one that propagated these

things.  He was the instigator.  He is the one that dug the rabbit

hole, he did not fall in it.

I want to address for just a minute some of the

sentencing comparisons that were made in the defense sentencing

memorandum.  There were two general categories.  One was just sort

of white board exercises comparing them to what other people would

get for other crimes.  I would submit that those are of zero value.

Those hypotheticals -- they're on page 14 of the sentencing

1   memorandum -- purport to, you know, white board some scenarios of,
2   what if somebody did this crime, what would they get.

3           What those hypotheticals ignore are the ten levels the
4   defendant got for being a leader organizer and for the -- targeting
5   official victims.  And it also ignores the four levels for the
6   grouping unit increases.

7           So, for example, his first white board thing here was
8   talking about shooting someone with a firearm and causing permanent
9   or life-threatening injury with a hate crime advancement and no plea
10  and he suggests that would yield a sentence of only 70 to 87 months
11  and so, therefore, this range is ridiculous.

12          Well, number one, he calculated the range right, it
13  actually should -- wrong.  It should actually be 29, not 27.  So the
14  actual Guideline range for those facts would be 87 to 108.  But when
15  you add ten levels for, if he shot an official victim and if he did
16  so as a leader and organizer of others, then his Guideline range
17  would jump up to 262 to 327 months.

18          And if you add to that again, the grouping units, if he
19  shot five people, which is what he's pleading guilty to here is
20  harming five people directly and then 900 and some indirectly
21  through relevant conduct, that would bump it up to a life sentence.

22          So those white board exercises in the brief, I would ask
23  the Court to totally disregard those.  That's just smoke and mirrors
24  and has no bearing on the fitness of the Guideline range in this
25  case.

         The other comparator that defense counsel used in the
brief -- and I want to address this for a minute -- is comparing him
to other January 6th defendants.  And I will say that this
comparison is not entirely inept -- inapt -- I apologize for the
double negative.

         I certainly recognize that there are some similarities to
that incident and those cases to this case.  They were driven
primarily by conspiracy theories.  It was an attack on American
democracy and due process like this case was.  The violence was
directed towards public officials, which is the case here.  In fact,
it was no surprise to me that the defendant was there and trying to
profit off of his presence there by selling an NFT of a photograph
he took while he was there.

         But there are many substantial differences to the
sentences that others have received in that case that are -- make it
difficult to have a direct comparator to the January 6th cases.

         One, is the January 6th incident involved thousands of
people, many of whom were there to attend a protest and got caught
up in a mob and it was a single event.  So for those that got caught
up in the mob, they would have a reasonable mitigating argument that
this was a momentary lapse of judgment.  You know, that we thought
we were going for one thing and it became something else and we
participated.

         Again, I can't possibly excuse that behavior.  But
compare and contrast that to Mr. Dever's conduct where he spent the

better part of a year master minding this scheme, promoting the
scheme, educating and recruiting people for the scheme. So it's
certainly not a single event and it was not a momentary lapse of
reason.

For most of the people who have been punished, or at
least many of the people that have been punished -- and I'm
certainly no scholar in what's been going on in the D.C. court for
the January 6 defendants -- but for many who have been punished, it
involves sort of variations of trespassing and vandalism and assault
on law enforcement officers. All those things are very bad, but
these are not the sorts of things that tend to carry high sentences.
And so for many of the folks there, that that would be a poor
comparator. This defendant, however, was a leader, organizer,
planner and promoter and he targeted the victims directly.

So what I would say to that argument is it's difficult to
compare this defendant to those January 6th defendants cited in the
defendant's memo in part because I don't know much about those cases
and I don't know if the Court knows more.

But, for example, he cites Stewart Rhodes, who received
an 18-year sentence. He was the leader of the Oath Keepers. I
don't know much about the case, but I do know his Guideline range
was actually substantially higher than that. It was four years
higher than that. The Government was asking for a 25-year sentence
as I recall. In fact, the Department of Justice has made the rare
move of appealing the sentence on the basis of the reasonableness --

1    the substantive reasonableness of it.  So I don't know how to well
2    compare that to this defendant.

3         But I would also -- Mr. Meggs' sentence, the 12-year
4    sentence, was also cited in the defense brief was also appealed for
5    similar reasons.

6         I will tell the Court though that there's a pending
7    sentence for the Proud Boys leader that was convicted at trial,
8    Enrique Tarrio and Joe Biggs, and the Government is seeking 33-year
9    sentences in that case.  So this case, obviously we're seeking a
10   substantially lighter sentence than those.

11        So I guess what I would say with respect to that
12   comparison, that I think the best the Court can do, I think that it
13   is right for the Court to compare this defendant to other leader
14   organizers or promoters.  I don't think it would be appropriate to
15   compare him to low-level participants that were not leaders
16   promoters, because that's not what Mr. Dever was in this case, but
17   the January 6 leaders that got substantially higher sentences than
18   what we are requesting.

19        The defendant's current Guideline range is 108 to
20   135 months and we are seeking a modest upward departure or variance
21   of three levels to 180 months.

22        And, again, as I said before, the Court can do that
23   entirely with the Guidelines.  The Court can do it because the
24   number of victims is substantially understated in this case.  The
25   Guidelines call for the possibility of an upward departure when the

number -- because the Guideline enhancement that applies to this
defendant is just two for targeting 900 people in 32 states.  It
would be the same as targeting just a few people here locally.

        So when defense counsel says that this Guideline range
substantially overstates his culpability, I have to snicker.  I
mean, the Guideline range is -- just completely fails to -- to
account for the damage he caused by a factor of several hundred.

        Another enhancement that I -- or another way to use the
Guidelines to effect this enhancement, and I did not think of this
prior to filing the sentencing memorandum, it would be using 3A1.4,
which is the terrorism enhancement.

        Now, to be clear, the terrorism enhancement does not
apply in this case under the Guidelines because the terrorism
enhancement is a 12-level enhancement and only applies when the
defendant is convicted of certain enumerated offenses and he was not
convicted of one of those.  So, again, I want to be clear.  I'm not
saying he should get a 12-level enhancement.

        But the Application Note 4 under 3A1.4 says that there
may be cases in which the offense was calculated to influence or
affect the conduct of government by intimidation or coercion or to
retaliate against a government conduct, but the offense involved or
was intended to promote an offense other than the enumerated
offenses.

        And that is exactly what we have here.  This defendant
was far more anti-government than he was pro-water.  And the purpose

of this whole exercise, this whole scheme perpetrated across the country, was to remove public officials at all levels of government and that's exactly what this application note calls for.

So, again -- and I apologize I didn't find this until after I filed the sentencing memorandum, but this is a within Guidelines way to reach the sentence that the Government is requesting. As is the number of victim enhancement.

Then there's also the variance arguments that are in the sentencing memo. That this crime is un-American and anti-democratic by its very nature and these crimes -- these threats were far worse than the typical.

So given that, there's multiple ways the Court can get there, but I would submit that a three-level upward variance is modest and appropriate in this case, especially when the Court considers -- again, similar to Ms. Moody -- what he could be facing in this case.

He -- by pleading by virtue of the plea agreement, he is only getting four levels for the grouping unit, he could get five -- it caps at five -- but if he got one more he'd be in a range of 121 to 151 right there if we'd just made him eat one more count.

And, of course, then there's the conspiracy to commit kidnapping charge, which, again as with the previous defendant, the facts that are in the factual basis currently before the Court would support that conviction. And had he been convicted of that crime or pleaded guilty to that crime -- well, if he'd pleaded guilty to that

crime, his Guideline range would be 262 to 327.  We are asking for a sentence substantially lower than that because at its heart, that's what this crime was.  It was threats, to be sure, but it was also conspiracy to have people kidnapped.  That's why the threats were so scary.

Lastly, I want to talk about the -- again, I don't want to repeat my arguments on the 3553(a) factors, but I do want to talk about deterrence.  I guess I agree with defense counsel that people that so fervently hold on to the beliefs that Mr. Dever holds on to, they are difficult to deter.  And in that case, I think we have -- unlike Ms. Moody, we have evidence to the contrary that Mr. Dever has been undeterred and has not learned the error of his ways and vacated the rabbit hole that he dug.

So I think specific deterrence is very much necessary for him because he has -- again, even as recently as last week he was talking with people about, you know, how this Court has no actual jurisdiction over him and that argument needs to be asserted.

But, again, I would say that the need for general deterrence is uniquely high in this case, as it is for Ms. Moody, but also -- especially so for Mr. Dever.  If he is allowed to have a below-Guideline sentence or a light sentence, certainly one as light as the one that defense counsel is suggesting, that would send a message to all these people that believe these things, that it's worth taking the risk because the consequences are not that severe.

The consequences of this -- and, again, I can't speak any

more eloquently than the victims did -- this was just four of the
victims.  This defendant's responsible for 900 people.  Perhaps they
don't all feel as strongly as these, but this is a sample of how
many people were affected by the rabbit hole that he dug.

So the need for general deterrence we need -- in addition
to keeping him from doing it again, we need to send the rest of the
organization that still exists, that still has access to his videos
and still has a FaceBook page, that the consequences will be severe
for targeting people who decided to raise their hand and serve in
public service.

It's this kind of thing that deters good people from
running for office, from taking positions like the Court has or that
I have.  It's this kind of stuff that deters people.  And that's a
threat to our system of government, it's a threat to our society and
it's anti-democratic and un-American.

So we think an 180-month sentence is not greater than
necessary and a modest increase and I ask the Court to embrace it.

Thank you.

THE COURT:  Thank you.

Mr. Dever, at this time you have the opportunity to
address the Court and to tell me anything that you feel I should
know before I make my decision regarding your sentence.

DEFENDANT DEVER:  Yes, your Honor.

First I'd like to place my right hand on the Bible here
(indicating) and swear under God on this Bible and my children's

```
 1   graves that at least 70 percent of the things that Mr. Gast has
 2   claimed are completely patently false and made up.
 3           This is very disturbing -- I'm very disturbed about some
 4   of the statements that have been made today regarding -- for
 5   example, he stated that last week I said that this Court had no
 6   jurisdiction in a phone call.  That conversation did not happen.
 7           There's been discussion that I've stated things while I
 8   was in custody to an informant that said I would burn people and
 9   this is completely false and not -- it doesn't exist.  I don't even
10   know where people come up with this kind of thought.  It's not
11   something I would say, never mind, speak.  And I'm very disturbed
12   that -- that that's been said about me.
13           These are things that I've heard in coming down to North
14   Carolina.  Some very disturbing inmates say some very disturbing
15   things about things that go on in the woods and so on and so forth
16   here that are upsetting, but these are not things that I would do.
17           I'm actually in a state of shock right now because of so
18   many things that were stated were beyond my scope of imagination.  I
19   admit that I did some things wrong.  I'm just -- I'm not
20   understanding how people can make statements that aren't accurate.
21   He's stating things that other people say and then claiming that I
22   spoke them.
23           There's a gentleman named Jim that called me on the
24   telephone that was storing my boat, a fishing boat -- an old fishing
25   boat -- on his property and he made statements about electric
```

guillotines and so forth and I was immediately shocked when he said
that.

He said that -- and I -- and I tried to tell the
prosecutors, both of them -- and I spoke to my attorney about
discussing details about this -- the PBI and how it was founded and
so forth and I wanted to discuss -- and as the -- my counsel advised
that he stated that -- I just can't believe what's being said about
me.  It's just shocking.  Okay.

So I offered to cooperate with -- six different times.  I
even had my wife get a copy of a bill, a phone bill from Verizon
from four years ago pertaining to things regarding that I wanted to
cooperate with.  I have two pages of notes here that I wanted to
discuss with the prosecutor and -- both prosecutors and the FBI
agent.  I wasn't afforded that opportunity.  I requested to
cooperate and I wasn't afforded the opportunity to cooperate.

And I was -- I had information -- when I sat down with
them in a meeting when I was *pro se*, I informed them that I was --
because of the Peoples Bureau of Investigation logo, somebody came
to me -- a woman said she was sex trafficked for -- as a child at
the highest level.  I informed them of this and they just looked at
me with a blank stare in their face and didn't even want to
acknowledge it.  I said, this woman is trafficked at the highest
level, and no one wanted to hear about it.

Do you -- do you recall this?

MR. ANDERSON:  Mr. Dever, this is your opportunity to

1    talk to the Judge.

2              DEFENDANT DEVER:  You were at the meeting.

3              THE COURT:  This isn't the time for Mr. Anderson to speak

4    further.  This is time for you to address the Court.  Anything that

5    you feel I need to know before I make my decision regarding your

6    sentence.

7              DEFENDANT DEVER:  Yeah.  So -- yeah, there's -- well, I

8    have an apology letter here -- I'll go to that -- but I just am very

9    shocked that there's been a confidential informant that stated

10   things, I guess to bring my level up, that are just beyond, like I

11   said, my comprehension.  Never stated those things.

12             And then the other thing that, I guess, increased my

13   level was some words that this gentleman, Jim, said on the telephone

14   that shocked me.  And I have 'em in my notes from Transylvania that

15   I wanted to discuss that phone call.  So the very thing that he's

16   holding against me, I wanted to actually discuss with him as an --

17   as an informant, cooperating.  I mean, it's right here.  The

18   electric guillotine indictments and Inter -- 500,000 military

19   indictments, Interpol, arresting properties for marshals and all

20   this -- all this nonsense that I don't want to hear any more from

21   anybody.

22             I'm done with this QAnon thing.  I don't want any part of

23   it.  And I try to tell these folks, but some people come to me --

24   because I created the Peoples Bureau of Investigation -- and they're

25   afraid of their own government so they came to me about things that

are quite disturbing. And I try to share 'em and then I turn into
some kind of villain. And it's really disturbing how this is -- how
this has transpired.

I mean, like I said, I'm shaking right now. I'm
trembling over it. Because I don't know how to handle it. It's
just overwhelming to have these things stated that are not true
about me.

So if I can just -- I guess I'll just read the apology
letter that I have prepared and then I guess it is what it is. But,
yeah, I wanted to -- I was told if I cooperated -- I thought the 41
to 51 months was extreme. The original plea deal that I accepted, I
thought that seemed extremely high. And then when these other
things occurred that were just added to it, it just keeps on piling
on.

I mean, just two days ago I found out it went from 108 to
135 to 180 based on probably a meth head -- I mean, everyone in
my -- in there needs help. They're on drugs or they're coming off
of drugs. I've had cellmates that are in really bad shape and I'm
not -- I'm being accused of something by people who aren't
reputable. I would never say these things that Mr. Gast has claimed
I've said. It's just preposterous.

So that's all I have to say regarding -- regarding the
enhancements and the Guideline enhancements. They're just --
they're not -- they're not founded in fact. They're -- there's --
he stated that I did some things, that I wasn't done with this for

six months.  I started an organic mushroom business in Christian

ministry.  And then when I found out poor Darris was incarcerated, I

thought at that time I was functioning under the First Amendment and

environmental court was real.  I'm sorry for believing that, but I

thought it was a real thing.

So when she got incarcerated, of course, I was very upset

with that, but there was no -- there was a six-month period where I

was indeed not doing -- I was done with it because I didn't want to

hear anymore from people telling me things that are going on within

the government.  I just didn't want to hear about it.  I didn't want

to know anymore so I was done with it.

And then when she got arrested -- I lived in their home

for two weeks and slept on the recliner -- because I was, like, in

shock that she got arrested for trying to stop poison water.  And

that's why I got pulled back into it and I didn't want any part of

it anymore.  I was, like, well, I don't want to be involved in this

anymore, but I got pulled into it.  Now I'm jail and I'm stuck in

it.  All I wanted to do was just go about my life, but it didn't

work out.

So I'm just going to read this at this point because I

don't know what else to do, but -- and I apologize for earlier

because when I heard Mr. Gast claim -- and people claim that the

website had a list of everybody, doxxing them.  It was a search

engine that was requested by the people who were serving the

documents.  Because initially the documents had to be served

registered mail on legal sized paper per Mr. Moody's -- the

environment -- the founder of the environmental court and

environmental law and all his environmental marshals.  He insisted

everything had to be on legal paper.

So when he -- when he did that and then it all changed, I

was, like, shocked that we had -- all of a sudden it was -- you

could fax the document.  That was when I started to think things

weren't right, but I actually thought everything that he had created

was real.  I thought this environmental court was a real thing.  The

documents that were -- I read them, I researched some of the content

of the documents and -- and it was real.

And so I was forced to get back into it because I had --

I felt so concerned about Darris, Ms. Moody and Chuck -- I mean, I

fell in love with these people -- this man became my friend.  For

two weeks, I slept on the recliner.  And I was trying to figure out

how to get her out of the situation that I felt like, you know,

obviously directly caused.

So that's why I had to get back in, but I didn't -- the

website was just a search was what I was getting at.  You would

search -- because people were having to pay $48 to serve registered

mail.  It wasn't something that was originally faxed.  Tom insisted

it had to be faxed -- or registered mail initially so people were

spending $48.  So the concern was, well, we're going to double --

have to maybe might serve the same person twice.  So everyone said,

well, how do we remedy that.

1    And then people had given advice and then they said,

2 well, let's track it so people can't do a double service because

3 it's expensive for people to spend money on this process, right.

4 Spending $50 to serve it registered mail.  So that's when -- that

5 process was going on.  I'm still just beside myself on the things

6 that have been said about me.

7    So when the registered mail process was taking place, I

8 was -- I was just going through -- the website -- I can't believe

9 this.  Oh, boy.  Just give me a second to gather myself here.

10    (Attorney Anderson conferring with the defendant, Timothy Michael

11    Dever, at counsel table briefly off the record)

12    DEFENDANT DEVER:  I appreciate you strongly encouraging

13 me to stop.

14    THE COURT:  Take your time, sir.

15    DEFENDANT DEVER:  So the documents were there on the web

16 site -- or you had to search is what I'm getting at.  There was no

17 doxxing or, like, list to go shopping to take people down or

18 anything of that nature.  It was so people didn't double serve.  You

19 had to type in a name, Bobby Smith, and then it would pop up if

20 Bobby Smith was served.  That was the only reason it was created.

21 It wasn't created for any nefarious means of going and getting

22 people and kidnapping them, of course.

23    And it was -- Tom explained it.  It was citizens arrest

24 under lawful process and I believed it.  I don't come from the world

25 of courts, I'm an entrepreneur.  I build businesses and start

1    businesses and I don't build courts.  I don't know how it all works,

2    but I was -- I guess I was hoodwinked, would be the proper word, so

3    if --

4            Can I sit down and read this?  I'm sorry.  I just got to

5    get closer to this.  This is just going to take about ten more

6    minutes of your time and then I'll -- we'll be done here.

7            THE COURT:  Take your time, sir.

8            DEFENDANT DEVER:  All right.  I apologize to the Court,

9    anyone who received the writs, those that served the writs and for

10   my participation regarding any documents created by Tom Murphy and

11   his environmental court.

12           Using hospice, my wife and I had to help both my father

13   and father-in-law die of cancer after they were reduced to skin and

14   bones.  We've lost numerous other family members and friends to

15   cancer.  My sister is a pediatric oncologist.  I read that they

16   sacrificed years off of their lives due to the stress of treating

17   children who are dying of cancer.

18           None of this excuses my participation.  However, this

19   history led to bad decisions on my part.  These bad decisions have

20   led to the destruction of my life and my innocent wife's life as

21   well.  I apologize to Anne for these difficult times.  I am sorry.

22   I hope to one day to be able to mend and repair our life together.

23           I want to stress, I am not attempting to minimize my

24   actions.  I wish to only explain why at the time of those actions I

25   did what I did.  In hindsight, at the very least, I should have

1    required wording to be edited on the documents.

2          When Tom Murphy contacted me and directed me to what he

3    claimed to be Erin Brockovich's website, EWG.org/tap water, I

4    entered my hometown zip code, as well as New York, Chicago, L.A. and

5    Detroit.  I was shocked and disturbed to discover the level of

6    cancer-causing carcinogens in the nation's tap water.

7          Over the next several days, Tom shared over 30 hours of

8    information.  I regrettably agreed to bring about awareness on a

9    chat app called Telegram.  This was bad decision number one and the

10   mistake of my lifetime.  One lie and document led to another.

11         Eventually Tom had good people believing a vast

12   conspiracy and those involved attempting to stop it would receive

13   American Express black cards, $2,000 service awards from the U.S.

14   Treasury for each writ served, thus, incentivizing people like

15   Darris Moody to serve huge numbers of writs.  Tom even claimed

16   passports indicating diplomatic immunity for doing humanitarian work

17   would be provided in the future.

18         He convinced many of us, even a cloistered nun who

19   completed a 25-year vow of silence for God, that public officials

20   were ignoring and hiding public law 92-500, the Federal Water

21   Pollution Control Act of 1972.

22         Numerous times Tom stated that President Nixon instructed

23   bar attorneys and prosecutors to ignore public law 92-500.  This

24   allowed him to pass along his disdain for bar attorneys.  Tom said

25   the law requires that local municipalities provide the cleanest tap

water possible based on the latest technology available.  He said
they were using technology from 1908.

Tom claimed his invention, the water reclaimator,
provided perfect tap water with optimum ph levels that actually
curbed cancer.  He shared patents and patent drawings and the
reclaimator.com website, featuring a news interview of a younger Tom
demonstrating his invention to a reporter back in the '90s.
Everything was very compelling and convincing.

If all of his claims were true and Americans were
drinking and bathing in cancerous toxic water for decades, stopping
it by any means, including citizens arrest, made sense at the time.

I previously met President Trump's cabinet member,
Michael Flynn -- General Michael Flynn at the We The People Reunion
in Kentucky.  The same place the woman approached me about being sex
trafficked, by the way.

After explaining the concept of the Peoples Bureau of
Investigation to him, he told me I needed to read the book, *A
Doctrine of a Lesser Magistrate*.  The book made it very clear I was
obligated to stand up for the people and do something regarding the
cancerous water.  To be aware a crime is occurring and do nothing is
a crime in itself.  We were told that we were putting an end to
intentional mass kill crimes against humanity that alleged crime --
these alleged crimes surely contributed to my father and
father-in-law's horrible deaths and millions of other Americans over
the last five decades.  Tom convinced me and others that we were

doing good works for God.

In hindsight, even if all of his claims were true, anyone that was initially involved is likely no longer alive never mind employed. I have no idea what percentage of his claims were true at this point. Tom's original writs were printed on legal-sized paper and contained two colored official court seals. Initially they had to be served using registered mail. One could say he was the Pied Piper of water.

We may live in a broken world in need of repair and reform, however, a large portion of any brokenness transcends generations making no one presently alive responsible. We were born into and have inherited many problems making us victims of circumstance. Therefore, any and all reform must be done Biblically with brotherly love as the foundation.

Tom Murphy's decades of frustration regarding his water reclaimator invention, his environmental court and his environmental marshals had his documents rooted in anger, not love. He was extremely angry with the EPA shutting down his invention.

When we first spoke, he may have been aware he was dying of cancer. He may have been experiencing mental challenges. He had a lot of anger. His anger rubbed off on others. I regrettably said and did things totally out of character.

Regarding the Peoples Bureau of Investigation, the reason Tom contacted me, due to COVID 19, state overreach, local business and church lockdowns, I was inspired by prayer and the Holy Spirit

1    to create the logo and the website for the people.  The logo -- the

2    four stars in the logo are the Father, the Son, the Holy Spirit and

3    the people.  That's what they represent.

4            In Illinois, basketball rims were removed from outdoor

5    parks and police do-not-cross tape was wrapped around playgrounds.

6    The people clearly needed a three-letter entity that was

7    representing them as governments overstepped in many ways.  The PBI

8    was to be just simply the rebranding of the people who have been

9    called conspiracy theorists, extremists and domestic terrorists for

10   simply exercising critical thinking and investigation of the

11   governments they created.

12           There are no rights or trademarks to the logo.  There is

13   no leadership.  Anyone can create a website, social media page, hat,

14   shirt, sign, et cetera.  It's open source and similar to Shareware

15   software.  I used to say the PBI is 350 million strong domestically

16   and eight billion strong internationally.  The PBI is everyone's

17   equally.  Everyone is born in an age of freedom.

18           Eventually there was a plan to have paid agents

19   protecting the people's rights in every county, but that would

20   require resources that do not currently exist.

21           I witnessed what I perceived as absolute despotism that

22   is mentioned in the Declaration of Independence.  The Declaration

23   states that it is not only a right but a duty to create new guards.

24           I cannot apologize for attempting to create new guards as

25   our founders made it clear it was actually my duty to do so.  I can,

however, sincerely apologize and take responsibility for educating
people in a process rooted in anger and fear.

I removed myself from the PBI six months prior to my
arrest.  My obligation to create new guards was over.  I felt that
others needed to step up and take over.  I had no interest, ability
or inclination to manage or operate something of the PBI's
magnitude.  The new guard was to be a gift to the people through me
to be used however the people saw fit.  I was the creator and the
caretaker for a time.  My work was done.

I'm a lifetime serial entrepreneur and can go from one
project to the next.  In the summer of 2022, I moved on to an
gourmet oyster farm and Christian ministry project with the intent
to educate impoverished communities and third-world country in low
tech mushroom farming processes.

For 15 years we owned a burglar, fire alarm, card access
and video surveillance company.  I always considered myself to be a
good Samaritan, not a criminal.

I recently discovered a distant relative, Robert de Vere,
signed the Magna Carta requiring King Edward to follow his own laws
and that our family motto is nothing is truer than truth.

I only wanted the Federal Water Pollution Control Act to
be upheld or Murphy's environmental court to see that our loved
ones, our children and grandchildren would no longer drink and bathe
in toxic cancerous water.  It is obvious I made bad decisions in the
process.  Decisions I will regret for the rest of my life.

1          The Sentencing Guidelines enhancements claim that I

2     intended to carry out kidnappings.  This is completely false.  There

3     are numerous recorded conversations on Telegram in which people

4     questioned who was going to enforce the writs.  Time and time again

5     Tom stated, no one in this group is going to be arresting anyone and

6     that serving the writs was enforcement as far as the group was

7     concerned.

8          The PBI Telegram chats and people involved were primarily

9     retired Christian women.  No one discussed performing arrests never

10    mind kidnappings.

11         I moderated chats for Tom and explained how to complete

12    his environmental court writs and how to serve them using registered

13    mail at the post office.

14         You might be asking yourself:  Why did you feel the need

15    to do any of this?  I come from a broken home.  I'm a sinner.  I

16    repent daily.  I was born again at the age of 36.  I'm a bond slave

17    to Jesus Christ, my Lord and Savior.  I'm a product of my

18    environment.

19         I was ten years old in fourth grade in 1976, the 200th

20    anniversary of our independence.  In sixth grade I was required to

21    study our founding fathers and their divine documents.  I had to

22    write book reports on each of the founding fathers.  I was asked to

23    lead the Pledge of Allegiance to our flag regularly over the six

24    most impressionable years of my life.

25         My father took me to the All Star game at Comiskey Park

in 1976.  (Brief pause).  I still had the red, white and blue
oversized ticket stub commemorating 200 years of independence.

Sorry.  I'm sorry, your Honor.

THE COURT:  Take your time.

DEFENDANT DEVER:  It comes as no surprise that my wife
purchased Hamilton tickets for the play -- or purchased tickets for
the play Hamilton for us and our adult children.  It's the only play
we all attended together.  There is a line at the end.  What do we
have, sir?  A republic, if you can keep it.  I believe the republic
has been on life support for multiple generations.

COVID overreach made it very clear.  The founding fathers
must be rolling over in their graves.  I love this country, the
founding fathers and their documents.  I know in my heart I was
looking out for all of God's people.  I have always been predisposed
to fix whatever I see that's broken.

When I was a young boy, I would patch and repair
imperfections on the cement curb in our cul-de-sac with a bucket of
mud.  The rain would wash it all away.  I would repair it over and
over again.

My wife and I and others are now paying for this
predisposition and I'm very sorry for my bad decisions.  The
decisions have cost me and my innocent wife everything.  She had to
shut down our 15-year-old arcade game sales e-commerce business, the
mushroom farm, ministry and vacate two office and warehouse spaces.
She had to sell, give away and donate inventory and 30 years of

collected tools, office equipment and property.  She most recently
was forced to sell our dream home our kids grew up in.  She now
lives in our son's basement and had to give up her dog temporarily.

        I know I made some bad decisions and mistakes in
judgment, costly mistakes I regret.  I wish I could take things back
and do things based in love rather than fear.

        Regarding my punishment.  I know I have experienced more
than enough.  My wife has as well.  We've lost everything.  I've
traveled over 30 hours in shackles and had numerous threats from
violent inmates in five prisons and jails.  I've been sleep-deprived
without my prescribed CPAP machine for sleep apnea for eight months.
I've been fighting vertigo for most of my incarceration.  I've lost
30 pounds.  I had to go to the emergency room at 4 a.m. for chest
pain caused by a blood pressure crisis of 190 over 151.

        I have more than learned my lesson.  I have had ample
time to reflect.  I spend days alone with the grand architect of the
universe and the Holy Spirit.  I read the New Testament five times
during my incarceration.

        This experience has humbled me.  It has further smoothed
any rough edges I may have had.  I choose to look at it as a
controlled burn and the grand architect's blessing in disguise.  I
tell myself and others that it has been an opportunity to refine
myself mentally, physically and spiritually.

        My wife is suffering far more than I am.  Years ago she
was diagnosed with trigeminal neuralgia, a nerve disorder that is so

painful that the doctors refer to it as the suicide disease.
Stress, noise or even a breeze hitting her face can trigger intense
pain that can last for days.  I don't know how she's managed to this
point.  She needs me by her side.  We've been married for 30 years.
Last month was our anniversary.

I apologize once more, Anne, and to everyone negatively
affected by the writs and my actions.  I apologize to your Honor for
this long speech.

This case is very different, complicated and involved and
I felt it required some clarification and explanation.  None of what
I said was intended to excuse my action.  I intended to only convey
why I did what I did.  I take full responsibility for educating,
aiding and abetting threatening communications.  I am very sorry.

I came into this as a caterpillar and I will leave as a
butterfly, but it will be on God's time.  I want to put this part of
my life in the past and focus on a ministry project centered around
the Golden Rule.

We are commanded to love one another.  We are commanded
to love our neighbor.  We are commanded to love our brothers and
sisters.  We are commanded to do everything in love.

I take these final words very serious and I hope and pray
you do as well, your Honor.  The words God and love are synonymous.
With them, I believe the words, as they are written, can be
restored.

I pledge allegiance to the flag of the United States of

1  America and to the Republic for which it stands, one nation under

2  God, love, indivisible, with liberty and justice for all.

3         Your Honor, I ask that you please take my wife's medical

4  condition into consideration and consider house arrest.  I humbly

5  request any and all leniency that you might consider.  The Bible

6  makes it clear that you have been divinely appointed to your

7  position.  May God continue to bless you, this Court, all the people

8  in this court today and this great country.

9         Thank you.

10         THE COURT:  Thank you, Mr. Dever.

11                    (Brief Pause)

12         THE COURT:  Mr. Dever, you may take your seat.

13         DEFENDANT DEVER:  Thank you.

14         THE COURT:  As the lawyers know, it's ordinarily my

15  practice to pronounce sentence and then to give an explanation, but

16  I think in light of these proceedings this afternoon, there are a

17  few things, by way of explanation, that I want to say before I

18  pronounce sentence in either of these cases.

19         It goes without saying that these cases are among the

20  most unusual and out of the ordinary that have come before this

21  Court in some time.  That is not to say that when we have cases that

22  are more ordinary, that they get less attention or anyone in this

23  process does not give them the appropriate consideration, but

24  this -- these two cases are so out of the ordinary that they have

25  consumed a considerable amount of consideration because there are so

many things in these two cases that just don't add up and don't make any sense.

I have to say, Mr. Dever was just talking, as part of his allocution, about how his objective in PBI was to protect people's rights. He talks about the founding documents of this country. He talks about reciting the Pledge of Allegiance to the flag of the United States of America.

And then I look at the offense conduct that we have involved in these cases. The offense conduct -- and frankly, the core elements of the offense conduct here are not in dispute, they're on paper, that there were public officials who were served with documents saying that they had been tried *in absentia* and convicted by some secret court of something that the accused -- in almost every case before this Court, where the accused had no responsibility; namely, something regarding water quality.

Of the 57 victims who are listed in this case, best I can tell, 53 of them have nothing to do with water quality. Nothing. But yet, they are informed anonymously that they have been tried *in absentia* and convicted of a crime regarding water quality.

Now, we spent all afternoon going through the particulars of due process regarding a federal sentencing. Trial and conviction without the defendant even being notified, that's not due process. That's no process at all. No right to be heard with regard to something that the accused person, the convicted person, has no responsibility over? That means that there was also no evidence.

1    Nothing.

2           The offense conduct in these two cases can only be

3    described as tyrannical.  If we heard that those sorts of things

4    took place, we would think that that was in North Korea.  I mean,

5    Stalin's show trials in the Soviet Union at least had show trials.

6    These didn't even claim to have show trials.  This was conviction *in*

7    *absentia* for something that the people had nothing to do with.

8           But even that wasn't the end of it.  Then there was the

9    publication at the post office, on a website, offering a bounty with

10   regard to these supposed convictions.  Some of the victims here who

11   have spoken in this court have taken on positions of authority in

12   our society where they tend to tick people off, namely, some

13   criminal defendants.  Sometimes domestic parties.  I understand how

14   that is.  Some of those folks might be willing to receive a bounty

15   for getting even.  These 57 people were put in the position that not

16   only had they been convicted without notice, but now they had a

17   price on their head.

18          And here we are talking about the sanctity of the

19   founding documents of this country.  Actions to protect people's

20   rights.  Reverence for this country and the founding fathers.

21   Pledging allegiance to the flag.  That just doesn't add up.  That

22   doesn't make any sense at all.

23          Then layered on top of that we have such things as the

24   two voice mail messages left for the Register of Deeds.  Where the

25   upshot was that the Register of Deeds was being informed that she

1 would be spared because of her association with this person who
2 claimed to have this great power as a member of this secret court to
3 try and convict people *in absentia* for things they had nothing to do
4 with.  That just seems so arrogant.  Tyrannical, vindictive
5 arrogance.
6          Now, having come to see that there's offense conduct
7 here, that is, as I say, tyrannical, vindictive arrogance, and then
8 to hear the description of who these two defendants were before any
9 of this took place.  How does that make sense to anybody?
10          The musician at church, the piano player at church, the
11 singer, the one who makes these gospel records.  Man who goes to
12 church on a regular basis, is looking out for how people in Africa
13 can learn how to feed themselves when they live in poverty.  How
14 does that add up?
15          When you put all of those pieces together, I believe that
16 the offense conduct does check all of the boxes for conspiracy to
17 commit kidnapping.  It would be the most unusual conspiracy to
18 commit kidnapping any of us have ever heard of, but it does check
19 the boxes of every one of the elements.
20          And as has been argued by the Government, the Guideline
21 range for that, if that had been a count of conviction, is well
22 higher than anything we're talking about here.
23          But then to layer on top of that -- even though both
24 defendants have obviously backed off of this position, but they
25 obviously had the position for at least some period of time -- that

in that arrogance, that the authorities of this country -- the
Marshal Service, this Court -- had no authority over them
whatsoever.  To claim this reverence for the founding documents, the
founding fathers, the rights of people and then to take those
positions, that is so grossly inconsistent that it makes it very
difficult to come up with an appropriate sentence.

Ms. Moody, I need for you to stand for the imposition of
the sentence.

Pursuant to the Sentencing Reform Act of 1984 and the
case of *United States vs. Booker*, it is the judgment of this Court,
having considered the factors noted 18 U.S.C., Section 3553(a), that
the defendant, Darris Gibson Moody, is hereby committed to the
custody of the United States Bureau of Prisons to be imprisoned for
a term of 24 months.

The Court recommends that the defendant be allowed to
participate in any available educational and vocational programs
during the period of imprisonment.

The Court calls to the attention of the custodial
authorities that the defendant has a history of mental health issues
and recommends that the defendant be allowed to participate in any
available mental health treatment programs while incarcerated.

Upon release from imprisonment, the defendant shall be
placed on supervised release for a term of three years.  Within
72 hours of release from the custody of the Bureau of Prisons, the
defendant shall report in person to the probation office in the

1    district to which the defendant is released.

2              While on supervised release, the defendant shall not

3    commit another federal, state or local crime and shall comply with

4    the mandatory and discretionary conditions of supervised release as

5    those have been adopted by the Court in the Western District of

6    North Carolina.

7              In addition, the defendant shall comply with the

8    following additional condition:

9              The defendant shall participate in a mental health

10   evaluation and treatment program and follow the rules and

11   regulations of that program.  The probation officer, in consultation

12   with the treatment provider, will supervise the defendant's

13   participation in the program, including but not limited to, the

14   provider, location, modality, duration, and intensity thereof.  The

15   defendant shall take all mental health medications as prescribed by

16   a licensed healthcare practitioner.

17             The defendant shall not communicate or otherwise interact

18   with any co-defendants, either directly or through some other

19   person, without first obtaining permission from the probation

20   officer.  And likewise, the defendant shall not communicate or

21   otherwise interact with any of the victims in this matter, either

22   directly or through some other person, without first obtaining

23   permission from the probation officer.

24             The Court finds that the defendant does not have the

25   ability to pay a fine or interest, and having considered the factors

noted in 18 U.S.C., Section 3572(a), the Court will waive the payment of a fine and interest in this case.

Payment of the criminal monetary penalties shall be due and payable immediately.

The Court has considered the financial and other information contained in the pre-sentence report and finds that the following is feasible:

If the defendant is unable to pay any monetary penalty immediately, during the period of imprisonment, payments shall be made through the Federal Bureau of Prisons Inmate Financial Responsibility Program. Upon release from imprisonment, any remaining balance shall be paid in monthly installments of no less than $50 to commence within 60 days of release until paid in full.

Throughout the period of supervision, the probation officer shall monitor the defendant's economic circumstances and shall report to the Court with any recommendations as warranted and any material changes that affect the defendant's ability to pay any Court-ordered penalties.

It is also ordered that the defendant shall pay the United States a special assessment in the amount of one hundred dollars.

Since so many of the reasons are going to apply to both of these, I'm going to give the reasons for the two sentences after I complete the pronouncement of sentence with regard to Mr. Dever.

You may take your seat, Ms. Moody.

1          Pursuant to the Sentencing Reform Act of 1984 and the

2     case of *United States vs. Booker*, it is the judgment of this Court,

3     having considered the factors noted in 18 U.S.C., Section 3553(a),

4     that the defendant, Timothy Michael Dever, is hereby committed to

5     the custody of the United States Bureau of Prisons to be imprisoned

6     as follows:

7          For 60 months as to Count One, 60 months as to Count Two,

8     60 months as to Count Three, 60 months as to Count Four and

9     60 months as to Count Five.

10          Now, those terms shall be served as follows:

11          Counts One and Two shall be served concurrently to one

12     another.  Counts Three, Four and Five shall be served concurrently

13     to one another.  However, those two terms, concurrent terms, will be

14     served consecutive to one another for a total term of imprisonment

15     of 120 months.

16          The Court calls to the attention of the custodial

17     authorities that the defendant has a history of mental health issues

18     and recommends that the defendant be allowed to participate in any

19     available mental health treatment programs while incarcerated.

20          Upon release from imprisonment, the defendant shall be

21     placed on supervised release for a term of three years.  That

22     consists of a term of three years as to each of Counts One through

23     Five with all of those terms to be served concurrently.

24          Within 72 hours of release from the custody of the Bureau

25     of Prisons, the defendant shall report in person to the probation

office in which the defendant is released.

While on supervised release, the defendant shall not commit another federal, state or local crime and shall comply with the mandatory and discretionary conditions of supervised release as those have been adopted by the Court in the Western District of North Carolina.

In addition, the defendant shall comply with the following additional conditions:

The defendant shall participate in a mental health evaluation and treatment program and follow the rules and regulations of such program.  The probation officer, in consultation with the treatment provider, will supervise the defendant's participation in the program, including but not limited to, the provider, location, modality, duration, and intensity thereof.  The defendant shall take all mental health medications as prescribed by a licensed healthcare practitioner.

The defendant shall not communicate or otherwise interact with any of his co-defendants in this matter, either directly or indirectly or through some other person, without first obtaining permission of the probation officer.

Likewise, the defendant shall not communicate or otherwise interact with any of the victims in this matter, either directly or through some other person, without first obtaining permission of the probation officer.

It is ordered that the defendant shall pay the United

1  States a special assessment in the amount of five hundred dollars.

2         The Court finds that the defendant does not have the

3  ability to pay a fine or interest, and having considered the factors

4  noted in 18 U.S.C., Section 3572(a), the Court will waive the

5  payment of a fine and interest in this case.  Payment of the

6  criminal monetary penalty shall be due and payable immediately.

7         The Court has considered the financial and other

8  information contained in the pre-sentence report and finds that the

9  following is feasible:

10        If the defendant is unable to pay any monetary penalty

11  immediately, during the period of imprisonment, payments shall be

12  made through the Federal Bureau of Prisons Inmate Financial

13  Responsibility Program.  Upon release from imprisonment, any

14  remaining balance shall be paid in monthly installments of no less

15  than $50 to commence within 60 days of release until paid in full.

16        Throughout the period of supervision, the probation

17  officer shall monitor the defendant's economic circumstances and

18  shall report to the Court with recommendations as warranted any

19  material changes that affect the defendant's ability to pay any

20  Court-ordered penalties.

21        Mr. Dever, you may take your seat as I proceed to this

22  next portion here.

23        My reasons for imposing these sentences -- and, first,

24  I'll try to address some of the things that are common to both of

25  them and also address the separate portions that are unique to each.

1           But under the sentencing statute, one of the factors --

2    in fact, one of the first factors to consider under subpart

3    (a)(2)(A) of the sentencing statute, Section 3553, is to fashion a

4    sentence that reflects the seriousness of the offense.

5           Now here, the seriousness of the offense -- first of all,

6    the seriousness -- the offense and the seriousness of the offense is

7    not having disdain for the Government.  There are a lot of people

8    who have disdain for the Government.  That -- you have the right to

9    hold those beliefs.  That's not what this sentence is about.

10          The seriousness of the offense is the direct attack and

11   affront to these individuals.  To not only inform them that they

12   have supposedly been convicted of some crime that they had

13   absolutely nothing to do with, but coupling that with actual

14   affirmative action regarding the information to the public -- at

15   post offices and on the Internet -- that there would be a bounty

16   paid, 10,000 to $20,000, for these people to be taken into custody

17   for something that's completely fictitious.

18          To do this anonymously, to do this where there's no place

19   to go to try to clear one's name, to do this with regard to 57

20   different officials of this area.  And not just because it causes

21   the misery that it causes -- because the damage is greater than what

22   these victims have explained, both in writing and here in court --

23   but it completely thwarts the political process that we have in this

24   country.

25          If you think the sheriff of your county is doing a

horrible job, get out the vote.  Organize a campaign against him.

Run against him.  Whatever it is that you think you need to do.  But

to try -- to put things in motion such that he might get taken into

the custody of some private citizen as to what might happen to him,

that's just not how it works.  That is not what you do when you're

unhappy with your government.

If public officials are exposed to this sort of thing,

nobody worth their salt is going to get involved in government.  And

you know what you're going to have then?  You're going to have the

worst possible people running the show.  You think things are bad

now?  This sort of thing continues, things are going to get a whole

lot worse.

Now, in addition to that, as I mentioned earlier, the

offense conduct that is involved here, I believe would have checked

the box of every element of conspiracy to commit kidnapping.  Even

though there may not have been an intent on the part of either

defendant that anyone actually be kidnapped or taken into the

custody of some private individual, but affirmative steps were

actually taken by both defendants that could have led to that taking

place.

And, of course, as explained here, the Guideline range

for that would have been double what I have imposed with regard to

Mr. Dever and about eight times, nine times what I have imposed with

regard to Ms. Moody.

So all of these things, I think, reflect the seriousness

of the offense. And if the only thing I did was to consider the seriousness of the offense with regard to both of these defendants, I can tell you that the sentence that I would have imposed would have been much longer.

And that's one place where I do -- I want to address some of the arguments that were made about comparing this both to what Mr. Gast was calling white board offenses, other offenses that are very dissimilar to these, and also comparing them to the January 6th events in Washington. That argument does not resonate with me at all.

First of all, comparing completely dissimilar offenses really does not come into the calculation of an appropriate sentence because to conduct that kind of exercise would be an endless task. You can come up with any sort of argument doing that. It is needless, it is pointless.

Comparing this to the events regarding January 6th is likewise pointless because with the January 6th event, you have people from one extreme to the other. Some really bad actors, some who just got wrapped up in bad activity. Picking and choosing out of that very large group who to compare these defendants to or these activities to is likewise a pointless exercise.

The only commonality is those were people who had disdain for the government and these defendants have disdain for the Government. But as I mentioned earlier, disdain for the Government is no offense whatsoever.

1          The question is what did you do?  What is the offense

2     conduct?  And here the offense conduct was very serious because of

3     the nature of what was expressed and what was put into action.

4          Now, having said all of that, with regard to Ms. Moody,

5     obviously I gave what I believe, under the circumstances here, is a

6     very lenient sentence and I have done that largely for the reasons

7     argued very ably by defense counsel.

8          Defense counsel has pointed to all of the various

9     elements here, both argued here as well as in the sentencing

10    memorandum that has been presented, about the essentially spotless

11    record that the defendant seems to have had before these events.

12         That even within the time that she has been detained that

13    she has been a model within the detention facility.  Helping out

14    other inmates, even cooperating very well with those who are

15    detaining her.

16         Having been very naive in being led into this sort of

17    behavior.  But, again, naivete isn't much of an excuse when you do

18    things that are this damaging.  I've taken into account the remorse

19    that Ms. Moody has expressed.

20         With regard to the issue of deterrence, I feel fairly

21    confident that we're never going to see Ms. Moody in this courtroom

22    again.  I think that she realizes that she got caught off on a

23    tangent for far, far too long and ended up going down a path that

24    was utterly destructive, not only in the harm to other people, but

25    in the harm to her own life, her family, her future.  But I still

need to keep in mind the factor under the sentencing statute to provide a sentence that affords general deterrence.

The message needs to be sent to the general public that you can dislike the federal government all you want to. You can dislike your local government all you want to. But that doesn't mean that you can threaten the officials, it doesn't mean that you can set things in motion that might cause them harm. It doesn't mean that you might do things that will cause other people to harm those officials. You can't do that. And there are strong consequences that come with doing that.

With regard to Mr. Dever, obviously I have imposed a sentence that is considerably longer than the one that I have imposed with regard to Ms. Moody. It is, however, considerably shorter than the one that has been advocated by the Government. I have imposed a sentence that is within the Guideline range taking into account the offense conduct that we have here.

Now, I want to be clear, the things that some confidential informant may have said in the Transylvania County Jail, that didn't add any enhancements. That doesn't add to the offense conduct. That really hasn't influenced my sentencing decision at all.

What has influenced my sentencing decision is the offense conduct. Namely, being the hub of the wheel with regard to the dissemination of these very harmful documents. Instructing those to whom these documents are sent on how to essentially effectuate the

harm, or part of the harm that they're intended to cause, and then
further facilitating the second part of the process and, that is,
posting on the Internet the information that could be used by other
people who are put in motion by this very nefarious process.

In that sense, the difference between these sentences is
because Ms. Moody was, in effect, a spoke of the wheel whereas Mr.
Dever was the hub of the wheel.  That is a big part of the
difference between the disparity between these sentences.  That is
why the general deterrence factor needs to be so much stronger with
regard to what Mr. Dever undertook here.

It's one thing for some local person who has disdain for
the government to write the wrong kind of letter, to maybe set
things in motion with regard to some public official that is
unlawful and nefarious in nature, but it's a totally different
matter to be the coordinator of such activity on what is nearly a
national basis.  And the message needs to be sent to the public in
general that if you do that, there are major consequences.

If you hate the government, get people who think like you
to band together with your resources, your finances.  Get people who
are running for office, get people who are in positions of authority
by legal means.

Don't let these sorts of expressions of homage to the
founding documents, the founding fathers, the Pledge of Allegiance
ring so hollow as they do when they are spoken by someone who did
something that was so tyrannical and so nefarious and directed to

1   people who were utterly innocent of what they were accused of doing.

2          That's why I see the seriousness of the offense with

3   regard to Mr. Dever to be substantially higher than that of Ms.

4   Moody.

5          I have taken into account the various arguments, all of

6   the arguments that were made by Mr. Anderson on behalf of Mr. Dever,

7   as I said, with regard to the comparisons to those other sorts of

8   cases or even the comparison to the Connecticut case, which was

9   obviously somebody who has some very severe mental illness issues.

10  Those ring very hollow for me.

11         But the other factors here -- the prior background of Mr.

12  Dever -- I've taken into account.  I've taken that into account as

13  much as anything else with the hope that that's what Mr. Dever is

14  going to return to after this matter is entirely completed.

15         As I said at the beginning, this is a case that in many

16  respects I find difficult, I find baffling.  I don't find it

17  baffling that some people find the government -- at both the

18  national, state and local level -- to be something to complain very

19  loudly about.  At times we all do that.  It's just this manner of

20  going about it that is such a deviation from anything that this

21  country stands for that leads me to these conclusions.

22         Ms. Jones are there any other issues regarding either the

23  sentence or the judgment?

24         MS. JONES:  No, sir, your Honor.

25         THE COURT:  Mr. Anderson?

1          MR. ANDERSON:  No, your Honor.

2          THE COURT:  Mr. Gast?

3          MR. GAST:  No, your Honor.  Thank you.

4          THE COURT:  Are there counts that need to be dismissed?

5          MR. GAST:  Yes, your Honor.  In Ms. Moody's case we would

6   move to dismiss, pursuant to the plea agreement, Counts Two through

7   62.

8          THE COURT:  And that will be allowed and those counts as

9   to Ms. Moody are hereby dismissed.

10         MR. GAST:  And Mr. Dever's case, pursuant to the plea

11  agreement, the Government moves to dismiss Counts Six through 58.

12         THE COURT:  And that will be allowed.  Those counts as to

13  Mr. Dever in his indictment are hereby dismissed.

14         Ms. Moody, you have the right to appeal the sentence that

15  I have imposed to the Fourth Circuit Court of Appeals on any grounds

16  that you have not waived.  You've pleaded guilty pursuant to a plea

17  agreement.  That plea agreement includes some waivers that may

18  substantially affect your appeal rights.  You'll need to consult

19  with your attorney as to what effect those waivers may be.

20         However, if you choose to appeal, you must file a written

21  notice of appeal with the clerk of this court within a period of 14

22  calendar days following the date of the entry of the final judgment

23  in this case.

24         If you choose to appeal but do not have the funds with

25  which to appeal, you have previously been determined to be indigent

1 and, therefore, you may appeal at government expense.

2 Do you understand this right of appeal as I have

3 explained it?

4 DEFENDANT MOODY: Yes, your Honor.

5 THE COURT: Mr. Dever, likewise, you have the right to

6 appeal the sentence that I have imposed with regard to your case to

7 the Fourth Circuit Court of Appeals on any grounds that you have not

8 waived.

9 You, likewise, have pleaded guilty pursuant to a plea

10 agreement. That plea agreement includes some waivers that may

11 substantially affect your appeal rights. You will need to consult

12 with your attorney as to what effect those waivers may have.

13 However, if you choose to appeal, you must file a written

14 notice of appeal with the clerk of this court within a period of 14

15 calendar days following the date of the entry of the final judgment

16 in this case.

17 If you choose to appeal but do not have the funds with

18 which to appeal, you have previously been determined to be indigent

19 and, therefore, you may appeal at government expense.

20 Do you understand this right of appeal as I have

21 explained it?

22 DEFENDANT DEVER: Yes, your Honor.

23 THE COURT: In closing, I'd reiterate, it is a most

24 unusual case. It is unfortunate, I think, that two individuals who

25 had led what appeared to have been exemplary lives got themselves

wrapped up in this, got their minds wrapped into doing something of this nature, particularly at this stage of life. But be that as it may, our nation cannot stand when things like this happen.

It is unfortunate what was done and in that sense, I think it's unfortunate that these sentences had to be imposed, but I find that they are necessary under the circumstances.

I wish both of you the best. I wish -- I hope that both of you see ways to not only redirect your lives, but reconstitute your lives so that nothing like this ever happens again and that you can get on a positive path. That won't be easy. I wish both of you the best.

Both defendants are remanded to the custody of the marshal. This matter is concluded.

Marshal, that's our last matter for the day. Please recess us until further call.

(Hearing concluding at 5:09 p.m.)

1                    UNITED STATES DISTRICT COURT

2                 WESTERN DISTRICT OF NORTH CAROLINA

3

4                 CERTIFICATE OF OFFICIAL REPORTER

5

6              I, Michelle A. McGirr, RMR, CRR, CRC, Federal

7    Official Court Reporter, in and for the United States District Court

8    for the Western District of North Carolina, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code, that the

10   foregoing is a true and accurate transcript of my stenographically

11   reported proceedings held in the above-entitled matter and that the

12   transcript page format is in conformance with the regulations of the

13   Judicial Conference of the United States.

14

15   Dated this 9th day of October, 2023

16

17                              /s/ Michelle A. McGirr
                                MICHELLE A. McGIRR
18                              RMR, CRR, CRC
                                U.S. Official Court Reporter
19

20

21

22

23

24

25